[Crim. No. 3694.   Third Dist.   Aug. 4, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. OSCAR W. FIERRO, Defendant and Appellant.

S. Carter McMorris, under appointment by the District Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Doris H. Maier, Assistant Attorney General, Edward A. Hinz, Jr., and Daniel J. Kremer, Deputy Attorneys General, for Plaintiff and Respondent.

FRIEDMAN, J.—Defendant Fierro was tried and convicted of possessing heroin in violation of Health and Safety Code section 11500. Defendant contends that the heroin introduced in evidence was the product of an illegal search and seizure.

On July 13, 1963, Fierro registered at a motel in West Sacramento under an assumed name. The motel manager, John Sommer, suspected him of being a narcotic user and pusher because he usually left his room only at nighttime, did not want the maids to clean his room, had visitors after dark and had a number of incoming and outgoing telephone calls. On June 17 when defendant went to the motel office to

pay for his room, Mr. Sommer noted that his eyes did not focus properly and that his features were not "content." Mr. Sommer did not want a narcotic user or pusher living at his motel. Mr. Sommer waited until defendant left the premises, then entered his room. The first item he observed was a white scratch pad on the desk with a burn mark, which he thought had been caused by a very hot spoon. He checked the wastepaper basket in the bathroom and found candy wrappers, and observed candy bars lying about the room. He thought the candy reflected an addict's need for sweets. He opened defendant's closed but unlocked suitcase and saw four vials containing pills or capsules, a spoon and a glass vial with a rubber plunger. Sommer returned to his office, phoned the Yolo County sheriff's office and reported what he had found. He spoke to a detective in the sheriff's office, who told him to return to the room and get some samples of the pills and turn them over to him. Whereupon he returned to defendant's room and took two pills and two capsules from the vials in the suitcase. He noticed a plastic bag containing 10 to 15 powder-filled rubber balloons and a folder paper containing white powders. He took two of the balloons and a sample of the white powder. Then he returned to his office and again called the sheriff's office. The sheriff's detective arrived and Sommer gave him the materials he had taken from the defendant's room. Defendant was then arrested. Upon analysis the powder in the balloons was identified as heroin and the paper bindle as cocaine. The capsules were seconal and the pills methadone.

Defendant presented no evidence, basing his defense on the contention that the narcotics found in his motel room were the product of an illegal search and seizure.

■ Generally, there can be no search of a house without a search warrant except as an incident to a lawful arrest therein; probable cause to believe that an article sought is concealed in the house furnishes no justification for searching it without a warrant. (*People* v. *Burke,* 61 Cal.2d 575, 579 [39 Cal. Rptr. 531, 394 P.2d 67].) ■ Constitutional protection against unreasonable searches and seizures extends to the citizen's hotel room no less than his home. (*Stoner* v. *California,* 376 U.S. 483, 490 [84 S.Ct. 889, 11 L.Ed.2d 856].)

The Attorney General does not argue lawfulness of the search of Fierro's hotel room. He points out that the invasion and seizure were the actions of a private citizen, while

constitutional limitations on search and seizure are aimed at governmental activity. He argues that the sheriff's detective requested Sommer to go into Fierro's hotel room for the limited purpose of acquiring samples of the pills; that discovery and sequestration of the heroin were not part of the mission Sommer was performing for the sheriff's office; in effect, to use the parlance of another branch of the law, Sommer was on "an errand of his own" and "outside the scope of his agency" when he found and took the heroin. Defendant, on the other hand, argues that Sommer, the private citizen, was an agent of the sheriff throughout his second foray into the hotel room.

The purpose of the rule excluding illegally seized evidence is deterrence of the lawless acts of federal and state officials. (*Mapp* v. *Ohio*, 367 U.S. 643, 648 [81 S.Ct. 1684, 6 L.Ed.2d 1081, 84 A.L.R.2d 933]; *People* v. *Cahan*, 44 Cal.2d 434, 448-449 [282 P.2d 905, 50 A.L.R.2d 513].) A lawless search and seizure by a private person acting in a private capacity is not a violation of constitutional guaranties by a state or federal agency. (*Burdeau* v. *McDowell*, 256 U.S. 465, 475 [41 S.Ct. 574, 65 L.Ed. 1048, 13 A.L.R. 1159]; *People* v. *Tarantino*, 45 Cal.2d 590, 595 [290 P.2d 505]; *People* v. *Randazzo*, 220 Cal.App.2d 768, 770-776 [34 Cal.Rptr. 65]; *People* v. *Johnson*, 153 Cal.App.2d 870, 873-877 [315 P.2d 468].)

If the private person perpetrates a lawless entry and seizure as the agent of public officials, the vicarious violation of constitutional limitations demands invocation of the exclusionary rule. (*People* v. *Tarantino*, *supra*; cf. *Massiah* v. *United States*, 377 U.S. 201, 206-207 [84 S.Ct. 1199, 12 L.Ed.2d 246].)

In this case official involvement in the lawless quest for evidence was so deep as to evoke the exclusionary rule. Having concluded his first foray into the hotel room, the hotel manager conducted his second expedition as the emissary of the sheriff's office. Whatever was produced or found by that expedition was produced or found by the sheriff's emissary. The officer had sent him into the room for the purpose of collecting evidence for prosecution. All was grist which came to his mill. The agency did not expire nor the emissary revert to private status at the precise second he put the pills in his pocket. The citizen was the officer's agent throughout the span of his foray. The search and sequestration of evidence were just as "official" as though the officer had acted in person.

In *People* v. *Tarantino, supra,* recorded conversations were barred by the exclusionary rule because an engineer employed by the police surreptitiously installed a microphone in the suspect's hotel room. The court noted (45 Cal.2d at p. 595) : "[The engineer] worked under the direct supervision of an inspector of police, and was paid with public funds." Here there was neither direct supervision nor pay. These are only subsidiary elements, however. In the context of an analogous situation the decisive factor has been described as "the actuality of a share by a [public] official in the total enterprise of securing and selecting evidence by other than sanctioned means." (*Lustig* v. *United States,* 338 U.S. 74, 79 [69 S.Ct. 1372, 93 L.Ed. 1819], per Frankfurter, J.) In brief, the question is one of the extent of government involvement in an invasion conducted by the private citizen.

The impotence of illegally seized evidence in California criminal prosecutions has been widely known since the *Cahan* decision, *supra,* of 1955. The errand upon which the sheriff's detective sent the citizen was blatantly lawless. It was self-frustrating because it would inevitably ruin the usefulness of evidence acquired as a result of the errand. The situation furnished the detective ample opportunity to apply for a search warrant had he troubled to do so. It is regrettable when the ignorant or unthinking violation of established legal standards destroys the utility of evidence and compels reversal of the conviction of a guilty man. Effective in-service police training and education would contribute mightily toward preventing such abortive and ruinous enterprises.[1]

The prosecution makes no claim of adequate evidence of guilt independent of the illegally seized evidence. Thus the judgment must be reversed. It is so ordered.

Pierce, P. J., and Regan, J., concurred.

A petition for a rehearing was denied August 30, 1965.

---

[1]The Director of the Federal Bureau of Investigations has stated: " 'Civil rights violations are all the more regrettable because they are so unnecessary. Professional standards in law enforcement provide for fighting crime with intelligence rather than force. . . . Incidents which give justification to charges of civil rights violations by law enforcement officers still occur. . . . Every progressive police administrator and officer must do everything in his power to bring about such an improvement that our conduct and our record will conclusively prove each of these charges to be false.' " (FBI Law Enforcement Bulletin, September 1952, pp. 1-2, quoted in *Elkins* v. *United States,* 364 U.S. 206, 218, fn. 8 [80 S.Ct. 1437, 1453, 4 L.Ed.2d 1669].)