[Crim. No. 10855. Second Dist., Div. Three. Feb. 21, 1966.]

THE PEOPLE, Plaintiff and Respondent, v. LE ROY
EVANS et al., Defendants and Appellants.

Bernard Grossman, under appointment by the District Court of Appeal, for Defendants and Appellants.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and David S. Sperber, Deputy Attorney General, for Plaintiff and Respondent.

FORD, J.—In a nonjury trial the defendant Evans was found guilty of grand theft as charged in Count I, of a violation of the Dangerous Weapons' Control Law (Pen. Code, § 12090) as charged in Count II, and of burglary as charged in each of the Counts VI and VII. The defendant Roquemore was found guilty of grand theft as charged in Count I, of a violation of the Dangerous Weapons' Control Law (Pen. Code, § 12090) as charged in Count IV, and of burglary as charged in each of the Counts VI and VII. Each defendant has appealed from the judgment. In addition, each has attempted to appeal from the order denying his motion for a new trial, but such an order is not separately appealable. (*People* v. *Bernhardt,* 222 Cal.App.2d 567, 570-571 [35 Cal. Rptr. 401].)

The defendants assert that, except as to the burglary charged in Count VI, the convictions "were solely based upon the introduction into evidence of loot obtained as a result of searches made of a motor vehicle in which the appellants were driving, and by a search of appellant Roquemore's apartment made well after he was taken into custody." They contend that each incident constituted an illegal search and seizure. A summary of pertinent evidence will be given.

Orley R. Barton, a police officer for the City of Los Angeles, testified that he arrested the defendants at 46th Street and Central Avenue on September 18, 1964, at approximately 4 p.m. Prior to the arrest the officer observed the defendant Evans' car as it proceeded westbound on 46th Street. The front license plate bore a number different from that on the rear license plate. He thought "possibly that the vehicle was stolen." He directed the defendant Evans to park his car at the curb. As Officer Barton approached the vehicle he looked into the car and "observed in the rear seat a typewriter, a sewing machine box, and a large red gas can, along with numerous items of clothing." Then, before Officer Barton or his partner, Officer Cron, said anything to him, the defendant Evans said, "It is not what you think; it belongs to my aunt." Officer Barton thought "possibly that the stuff might be stolen, due to his statement." He further testified that he

"immediately advised both defendants of their rights to an attorney; that they could remain silent; anything they stated could be held against them as evidence."

Officer Barton then told both of the men to alight from the vehicle and asked the defendant Evans for his driver's license or some identification. Evans produced a valid California operator's license. The defendant Roquemore then said that his identification was in the glove compartment. In response to a question as to whether, up to this point, he had placed the defendants under arrest, the officer stated: "Technically, yes, I had, for possible GTA, or possibly involved in the crime of burglary or robbery." He placed them under arrest when he "first had them pull to the curb, due to the switched plates on the vehicle." He regarded them as being under arrest at the time when he advised them of their constitutional rights.

There was no registration card on the steering column of the car. The defendant Evans produced a "pink slip" for the automobile which contained a reference to the number on the front license plate. At first Officer Barton refused to permit the defendant Roquemore to reenter the car to get his wallet out of the glove compartment because he feared that there might be "something in there besides his driver's license." Officer Barton's partner attempted to open the glove compartment but was unable to do so. The officers then, with their guns drawn, allowed Roquemore to open the glove compartment and he thereupon obtained his wallet and stepped out of the vehicle.

Further testimony of Officer Barton was: "Then my partner, Officer Cron, looked under the right front seat of the vehicle, where Mr. Roquemore had been sitting, at which time under a rag he found a .38 revolver, 3 inch blue steel. . . . my partner, Officer Cron, removed the cartridges. . . . We then immediately placed the handcuffs on the defendants, both defendants, and placed them in the rear seat of our police vehicle, and asked for another unit to assist us; and also requested tow service on the defendants' vehicle. We had the two defendants transported to Newton Station Detective Bureau, and also, when the tow service arrived, we had them also tow the vehicle to Newton Police Station where we opened up the trunk of the car, and in the trunk of the car was a large 50 horsepower outboard motorboat engine."

The deputy public defender representing the defendants stated an objection as follows: "Your Honor, we will object to testimony in regard to anything recovered at the time the car was moved to Newton Station and searched there. I think

People vs. Burke indicates a search subsequent to the arrest, at a different location—that was an instance when it was in the impound—is improper.'' In response to that objection, the People made further inquiry of Officer Barton, who testified that after the gun was found he and his partner searched the rest of the car. They opened the trunk and observed the outboard motor, together with ''several articles of clothing and different miscellaneous articles.'' The motor was very large; the officers did not have room in their vehicle in which to place it and they left it in the Evans car so that it could be hauled to the police station. The car was impounded. At the station, approximately 15 to 20 minutes after the arrest, Officer Barton removed the outboard motor from the car. As the motor was being lifted out of the vehicle, Officer Barton observed a ''.22 automatic, blue steel, 7 inch'' gun underneath the motor. The defendants' objection to the evidence as to the motor was overruled.

In the course of the booking process Officer Barton removed a Gruen watch from the defendant Roquemore's wrist. Officer Cron removed another watch from the wrist of the defendant Evans at the jail while he was being booked.

In the course of cross-examination, Officer Barton testified: ''I arrested them on the switched plates. Due to the typewriter, the sewing machine, and the miscellaneous articles in the back seat, and due to the defendant Evans' statement, 'It is not what you think, it belongs to my aunt', on this assumption I placed them under arrest. . . . Well, the initial stop was for possibly a stolen vehicle and/or possibly some other crime due to all the stuff in the vehicle. . . . Q. I mean, you already had them under arrest at the time you began thinking of burglary and robbery? A. Yes, ma'am. Q. So, originally, you arrested them strictly on the switched plates? A. Switched plates, yes ma'am.'' At that time he had no report that any of the articles in the car were stolen. The defendant Evans stated that he did not have the money to register his car, so a friend gave him the license plate which was on the rear of the car.

When the People offered in evidence the guns removed from the car, two photographs of the outboard motor, and the watches taken from the persons of the defendants, defense counsel expressed an objection which was in part as follows: ''I would object to all the Exhibits, your Honor, that have been offered here, on the theory that they were the product of an illegal arrest, and a search that was made without probable cause.'' The objection was overruled.

With respect to the articles which were in the defendant

Roquemore's apartment, the People called McArthur Campbell as a witness. He testified that he knew both defendants. In late September or early October of 1964, he received a letter bearing the defendant Roquemore's signature and he subsequently talked to him at the county jail. He told Roquemore that he had gone to his apartment, as he had been requested to do in the letter, but that the woman in charge there said that he could not take anything away until she consulted the owner of the premises. Thereafter he talked to her again and she said that he could enter the apartment if he could obtain the key. Roquemore told him to take the letter and show it to the arresting officer and see if that officer would give him the key so that Mr. Campbell could get the "things" in the Roquemore apartment.

Mr. Campbell further testified that thereafter he went to see Sergeant Ruddell and showed him the letter. Mr. Campbell, followed by Sergeant Ruddell and another officer, drove to the apartment. The officers then gave him the key. He opened the door and returned the key to the officers who then left. Thereupon Mr. Campbell entered the apartment and removed some articles, which he took to the Newton Street Police Station. He made two trips, taking everything he could, and turned the articles over to Sergeant Ruddell and his partner.

On cross-examination Mr. Campbell testified that the defendant Roquemore told him to take the articles to his (Mr. Campbell's) place. When he went to the Newton Street Police Station the officers said that they wanted to look at all of the things. He told them he did not want to have the "stuff" at his house. The officers asked him to bring the articles to the police station, and he did so at their request. On redirect examination he testified that he was not ordered to bring the property to the police station but that he did so freely and voluntarily.

Officer Ruddell testified that he was the investigating officer in the case. Mr. Campbell brought to him a shaving kit, a wrench and a watch.[1] When the People offered those articles

[1]Mrs. Martin, who testified as to the burglary upon which Count V was based, identified the shaving kit as being part of the property taken from the Martin home. The defendants were found not guilty as to this count.

Mr. Hernandez, who testified as to the burglary upon which Count VI was based, identified the wrench as one which had been taken from his home. His initials, "BH", were on the wrench.

Mrs. Henry, who testified as to the burglary upon which Count VII was based, identified the watch as one which had been taken from her home.

in evidence, defense counsel objected. On behalf of the defendant Roquemore the objection was placed on the ground that Mr. Campbell was acting as an agent of the police when he removed the articles from the Roquemore apartment and took them to the police station. The objection on behalf of the defendant Evans was placed on the ground that he gave no permission to Mr. Campbell to enter the apartment. The objections were overruled.

The defendant Roquemore testified on his own behalf. Part of his testimony was: "Well, up until the officer went under the seat, we were neither—it wasn't indicated to us verbally, nor physically, that we were under arrest at no time until the officer went under the seat and under the floor mat and removed the revolver." With respect to Mr. Campbell, he testified that he did not give him authority to do anything with the property except to take it into his own control. His testimony as to the offenses charged was exculpatory in nature.

The defendant Evans testified on his own behalf. He said that he showed one of the officers "the registration to the car" and also the "pink" to the car. The other officer searched the vehicle and discovered a gun under the front seat. Then the defendants were handcuffed. The trunk of the car was opened and a "boat motor" was found to be in there. The officer asked him where he was going and he replied that he was taking the "stuff" to his sister's house. He did not say that it was not what it looked like and that the articles belonged to his aunt. He explained to the officers why the license plates were different. His testimony as to the offenses charged was exculpatory in nature.

█ The first question to be resolved is whether there was probable cause for the arrest of the defendants. █ The governing law is stated in *People* v. *Nebbitt,* 183 Cal.App.2d 452, at page 456 [7 Cal.Rptr. 8]: "As to what constitutes 'reasonable cause', there is no formula for its determination, each case being dependent on its own facts and circumstances (*Go-Bart Importing Co.* v. *United States,* 282 U.S. 344 [51 S.Ct. 153, 75 L.Ed. 374]; *People* v. *Wickliff,* 144 Cal.App.2d 207 [300 P.2d 749]). █ 'Reasonable cause' is defined by our Supreme Court 'to be such a state of facts as would lead a man of ordinary care and prudence to believe and conscientiously entertain an honest and strong suspicion that the person is guilty of a crime (citation). █ Probable cause has also been defined as having more evidence for than against; supported by evidence which inclines the mind to believe, but leaves some room for doubt (citations)' (*People* v. *Ingle,*

53 Cal.2d 407 [2 Cal.Rptr. 14, 348 P.2d 577]; *People* v. *Fischer,* 49 Cal.2d 442 [317 P.2d 967]; *People* v. *Kilvington,* 104 Cal. 86 [37 P. 799, 43 Am.St.Rep. 73]). ▉ As to how reasonable cause shall be determined in a given case, [the law is that] the court shall consider the facts and circumstances presented or apparent to the officer at the time he was required to act [citations].''

▉ In the light of the facts which have been related, it is clear that the officers had the duty to stop the Evans vehicle when they observed it being operated on a public street with a front license plate bearing a number different from that which was on the rear license plate since a violation of the Vehicle Code was evident. (See *People* v. *Odegard,* 203 Cal. App.2d 427, 431 [21 Cal.Rptr. 515]; *People* v. *Nebbitt, supra,* 183 Cal.App.2d 452, 457-458.) Moreover, as aptly stated in *People* v. *Galceran,* 178 Cal.App.2d 312, at page 316 [2 Cal. Rptr. 901]: ''It is a matter of common knowledge that automobile thieves often switch license plates from one car to another in order to conceal the identity of the stolen vehicle and that the registration slips on stolen vehicles are often altered or forged.''

▉ Officer Barton testified that he initially arrested the defendants because of the ''switched plates.'' But other facts were brought to his attention. He observed a typewriter, a sewing machine box, and miscellaneous articles in the back seat of the automobile. Before any question was asked or accusation made, the defendant Evans volunteered an exculpatory statement, ''It is not what you think, it belongs to my aunt.'' Under the circumstances the presence of the articles of personal property in the car, viewed in the light of Evans' statement, constituted such a state of facts as would lead a man of ordinary care and prudence to believe and conscientiously entertain an honest and strong suspicion that the defendants had obtained the articles by theft. The existence of such reasonable cause justified Officers Barton and Cron in continuing to hold the defendants under arrest, even if the defendant Evans showed the officers proof that the automobile belonged to him.

▉ The search of the vehicle, including the trunk portion thereof, without a warrant was lawful as a search incidental to arrest. (See *People* v. *Burke,* 61 Cal.2d 575, 579-580 [39 Cal.Rptr. 531, 394 P.2d 67]; *People* v. *Nebbitt, supra,* 183 Cal. App.2d 452, 461.) Unlike the situation in the *Burke* case, the search of the trunk of the Evans car was made at the place of the arrest and contemporaneously therewith. That search

disclosed the outboard motor. The fact that, because of its size, it was conveyed to the police station in the Evans vehicle did not detract from the legality of the search and ensuing seizure made at the scene of the arrest. Consequently, since no right of either defendant was violated by reason of the removal of the outboard motor from the car at the police station, Officer Barton was not required to overlook the gun which became visible when the motor was lifted from the trunk. Under such circumstances the possession of the gun was legally obtained by the police and it was properly received in evidence. (See *People* v. *Galceran*, *supra*, 178 Cal.App.2d 312, 317.)

 The problem remaining for consideration is whether the articles of property delivered by Mr. Campbell to the police were obtained by means of conduct which constituted an illegal search and seizure. A problem of a kindred nature was presented to the Municipal Court of Appeals for the District of Columbia in *Moody* v. *United States*, 163 A.2d 337. In that case the victim of a theft went with a police officer to the defendant's apartment. The door was open. The victim saw his property inside the apartment and he entered and retrieved it. He thereupon handed the articles to the officer who had remained in the hallway of the building. There was no evidence that the officer did anything to induce the victim's actions or that he made any effort to deter him. In holding that the evidence was inadmissible, the court stated in part (163 A.2d, at p. 340): "Under the aforementioned standard, we believe that there was a participation by the arresting officer and that the complaining witness acted as an arm of the police in reducing the articles to possession. The construction to be attached to the Fourth Amendment does not permit of evasion by circuitous means. The protection thus afforded may be violated just as effectively through the intervening agency of one not a policeman. While no objection can be raised to the propriety of the arresting officer's conduct in merely viewing the articles from the adjacent hallway, we cannot characterize him as a willing but innocent beneficiary in standing silently by while the appropriation was taking place. The officer certainly recognized the evidentiary value of the goods themselves. He could not therefore escape the necessity of obtaining a search warrant when he had the reasonable alternative of posting a guard at the door until the warrant could be procured.

"Admittedly, the complaining witness only recaptured goods to which he, as owner, was legally entitled; nevertheless, such fact is not controlling in considering the legality of the

means by which the stolen articles came into the possession of the police under the circumstances of this case. The problem rather is whether the physical goods could be used as evidence to convict the accused of the crime.''

In *State* v. *Scrotsky*, 39 N.J. 410 [189 A.2d 23], the question involved was the legality of the search of the defendant's premises and the seizure therein of the incriminating articles. The complaining witness, Mrs. Seymoure, owned an apartment building. She rented an apartment to the defendant, reserving no right of entry as part of the letting. Mrs. Seymoure's apartment was entered and some personal effects were taken. Shortly thereafter she thought that she saw the defendant going over the back fence with a duffle bag. Later that evening Mrs. Seymoure and two police officers went to his apartment and the defendant's wife admitted them. Mrs. Seymoure pointed out certain articles which she said were stolen from her. The next day Mrs. Seymoure and the same officers returned to the defendant's apartment. No one was home but the door was unlocked. They entered and Mrs. Seymoure identified her property for the officers. They told her that a detective would be sent to bring the articles to headquarters. A day later Mrs. Seymoure, accompanied by a police detective, reentered the defendant's apartment. In the detective's presence she reclaimed her allegedly stolen property. The detective told her to put the property in a suitcase and bring it to headquarters. Thereafter they went to police headquarters where, after the articles were photographed, Mrs. Seymoure was permitted to take them home. Later the defendant was arrested on a public street.

In holding that there had been an illegal search and seizure which precluded the use of the evidence, the Supreme Court of New Jersey stated (189 A.2d, at p. 25) : ''But Mrs. Seymoure had no right of entry. . . . Under the circumstances present at the time, her claim to admission was no greater than that of a stranger. She could not give any higher status to herself or to the officers as against the tenant. Obviously, she went into the apartment with the officers and seized the property under color of their authority and as a participant in a police action. . . . It is idle to say that the officers did not conduct the search or seize the articles later used to convict Scrotsky; that they simply accompanied Mrs. Seymoure while she entered his apartment, searched for and reclaimed her property. For purposes of applying the test of the Fourth Amendment, she must be considered their instrument. The suggestion is that if she had gone there on her own, entered

and retrieved the allegedly stolen property, and turned it over to the authorities, it would have been admissible in evidence in the subsequent prosecution because there was no official participation in the illegal search and seizure. And, the argument proceeds, that since the officer, although entering with her, stood by while she located the property, and then told her to put it in a suitcase and take it along to headquarters, he was a spectator and not an efficient actor in the proceeding. The contention is unrealistic. Despite the existence of ample time to obtain a search warrant, the detective and Mrs. Seymoure went to the apartment without a warrant . . . for a dual purpose, she to recover her property, he to investigate and obtain evidence of Scrotsky's crime. The search and seizure by one served the purpose of both, and must be deemed to have been participated in by both.''

The Supreme Court of New Jersey further stated (189 A.2d, at p. 26): ''In the present situation, the search and seizure resulted from unlawful concert of action on the part of Mrs. Seymoure and the police officers. *Lustig* v. *United States* (1949) 338 U.S. 74, 79 [69 S.Ct. 1372, 93 L.Ed. 1819, 1823]. Mrs. Seymoure simply acted as an arm of the police in reducing the articles to possession. *Moody* v. *United States* (Mun.Ct. App. D.C. 1960), 163 A.2d 337. Thus, *Mapp* v. *Ohio* [367 U.S. 643 (81 S.Ct. 1684, 6 L.Ed.2d 1081)] stands squarely in the path of their use against Scrotsky, and a conviction based upon their admission in evidence cannot stand.''

In *Green* v. *Yeager* (D.C.N.J.) 223 F.Supp. 544 (affd. 332 F.2d 794), the factual situation was similar to that involved in *State* v. *Scrotsky, supra,* 39 N.J. 410 [189 A.2d 23], and the court followed the reasoning of the *Scrotsky* case.

In the recent case of *People* v. *Fierro,* 236 Cal.App.2d 344 [46 Cal.Rptr. 132], a motel manager entered the room of the defendant during his absence and observed articles which he thought gave support to his suspicion that the defendant was a narcotic user. He phoned the sheriff's office and reported what he had seen. A detective in that office told him to return to the room, obtain some samples of the pills and turn them over to the detective. The motel manager removed articles from the room and delivered them to the detective when he later came to the motel. The defendant was then arrested. In reversing the judgment the court stated in part (236 Cal. App.2d, at p. 347): ''In this case official involvement in the lawless quest for evidence was so deep as to evoke the exclusionary rule. Having concluded his first foray into the

hotel room, the hotel manager conducted his second expedition as the emissary of the sheriff's office. Whatever was produced or found by that expedition was produced or found by the sheriff's emissary. The officer had sent him into the room for the purpose of collecting evidence for prosecution. All was grist which came to his mill. The agency did not expire nor the emissary revert to private status at the precise second he put the pills in his pocket. The citizen was the officer's agent throughout the span of his foray. The search and sequestration of evidence were just as 'official' as though the officer had acted in person.'' The court further said: ''In brief, the question is one of the extent of government involvement in an invasion conducted by the private citizen.''

When the facts of the present case are compared with those of the *Moody, Scrotsky, Green* and *Fierro* cases, differences are found to exist. The significance of such differences must be determined.

The police officers accompanied Mr. Campbell to the location of the Roquemore apartment and there handed the key to him. Mr. Campbell opened the door and returned the key to the officers who thereupon departed before Mr. Campbell entered the apartment. In obtaining the key and entering the apartment and removing the personal property, Mr. Campbell was doing what the defendant Roquemore had requested. To that extent the factual situation is different from that in each of the cases noted, inasmuch as possession of the articles of property was obtained with the consent of the defendant by the person who thereafter delivered those articles to the police.

The core of the problem presented is whether Mr. Campbell did in fact act as an arm of the police in the course of the events which culminated in the delivery of physical possession of the articles to the police. Mr. Campbell's testimony was that, while the officers asked him to bring the articles to the police station, he was not ordered to do so and that he acted freely and voluntarily. But such a request had more than ordinary significance because of its official character. The fact is that Mr. Campbell did what the officers asked him to do and thus complied with their wishes. Such conduct was obviously not consonant with the purpose for which the defendant Roquemore had given him authority to enter the apartment and remove articles therefrom. Accordingly, a conclusion that Mr. Campbell did not act as an arm of the police is unrealistic. Consequently, the articles which came from the Roquemore apartment were erroneously received in evidence.

Whether the error was prejudicial in nature is a question which remains for resolution. As has been noted in the footnote of this opinion, the defendants were found not guilty with respect to the burglary of the Martin residence as charged in Count V.

The evidence as to Count VI included testimony by Mrs. Herrera, who lived near the Hernandez residence, that on the afternoon of September 1, 1964, she observed the defendant Evans walk down the front walk on the Hernandez premises and go to the sidewalk. He had nothing in his hands. The defendant Roquemore was in an automobile in front of the Hernandez home. There was a white bundle in the front seat of the car. Mrs. Herrera had never seen the two men before this incident. After the two men drove away, Mrs. Herrera went over to the Hernandez house; the back door was open and the padlock was broken. It is obvious that such circumstantial evidence against the defendants was substantially strengthened by the evidence that a wrench bearing Mr. Hernandez' initials, and which was taken from his home in the burglary, was part of the property obtained by Mr. Campbell from the Roquemore apartment and delivered by him to the police. After a review of the entire cause, this court has formed the opinion that it is reasonably probable that a result more favorable to the defendants would have been reached as to Count VI if such illegally obtained evidence had not been introduced at the trial. Consequently, there has been a miscarriage of justice as to that count. (*People* v. *Watson,* 46 Cal.2d 818, 834-837 [299 P.2d 243].)

We find no reasonable basis, however, for a conclusion that there was a miscarriage of justice with respect to Count VII which was based upon the burglary of the Henry home. While Mrs. Henry identified a watch found by Mr. Campbell in the Roquemore apartment and given by him to the police as being one of the items taken in the burglary, she also testified that both the watch removed from the defendant Evans' wrist and that removed from the defendant Roquemore's wrist in the course of the booking process at the jail were articles taken from her home in the burglary. Consequently, it does not appear to be reasonably probable that a result more favorable to the defendants would have been reached as to Count VII in the absence of the illegally obtained evidence.

The evidence made available by Mr. Campbell's actions had no bearing on the violations of the Dangerous Weapons'

Control Law (Pen. Code, § 12090) alleged in Counts II and IV. The grand theft charge embodied in Count I was based on the alleged theft of the outboard motor from Joseph Jones. Mr. Jones testified that on the morning of September 18, 1964, he discovered that the motor had been taken from the yard where he kept it. The defendant Evans had been employed by him about two years prior to that time and had been on the premises with Mr. Jones. Under the applicable test, there is no reasonable basis for a conclusion that the introduction of the evidence improperly obtained by means of Mr. Campbell's actions caused any prejudice to the defendants in the determination of the issues relating to Count I.

The appeal of each defendant from the order denying his motion for a new trial is dismissed. The judgment with respect to the defendant Evans is affirmed as to Counts I, II and VII and is reversed as to Count VI. The judgment with respect to the defendant Roquemore is affirmed as to Counts I, IV and VII and is reversed as to Count VI.

Shinn, P. J., and Kaus, J., concurred.

The petitions of the appellants and the respondent for a hearing by the Supreme Court were denied April 22, 1966.