497 P.2d 835

**STATE of Arizona, Appellee,**

v.

**Forrest D. AIKINS, Appellant.**

**No. 1 CA–CR 345.**

Court of Appeals of Arizona,
Division 1,
Department A.

June 1, 1972.

Rehearing Denied June 29, 1972.

Review Denied Sept. 12, 1972.

Gary K. Nelson, Atty. Gen., by William P. Dixon, Asst. Atty. Gen., Phoenix, for appellee.

Flynn, Kimerer, Thinnes & Galbraith, by John J. Flynn and Tom Galbraith, Phoenix, for appellant.

DONOFRIO, Judge.

This is an appeal from a judgment and conviction of possession for sale of heroin and possession for sale of cocaine, both counts in violation of A.R.S. § 36–1002.01, and a sentence imposed thereon of five to fifteen years to run concurrently in the Arizona State Prison.

The virtually uncontested facts are as follows: Defendant had been placed under surveillance by narcotics agents for several months early in 1969. Information had apparently been garnered from many sources, and especially from an informant named A. B. Coleman, that defendant was purchasing quantities of heroin in Mexico and transporting it to Phoenix for sale to three dealers whom he trusted. No suspicious criminal activities were discovered as a result of the investigations even though the scope of the surveillance was extensive. Officers staked out both Aikins' home and office. On May 21, 1969 Officer Moody received a telephone call from an unidentified confidential informant who had previously conferred with Moody regarding the possibility of providing tips about Aikins trafficking in narcotics. The informant's call which was received at 4:30 p. m. told

Moody that at 4:45 p. m. that afternoon Aikins would arrive at 13th Street and McDowell Road in his 1969 Ford with a quantity of heroin. Officer Moody testified that the informant had overheard a telephone call which was placed by Aikins at his gas station to a Mr. Jackson. When the police arrived at the designated spot, Aikins arrived shortly thereafter and remained in his car, moving his automobile backward and forward several times in front of a Jack-in-the Box Drive-Thru. Soon thereafter the officers arrested defendant, patted him down, searched his trunk and found a green ammunition box in a special built-in compartment of the trunk. Inside the box were quantities of heroin and cocaine contained in two Awake orange juice cans.

On appeal we are called upon to decide the following issues:

1. Was there probable cause to search defendant's car?
2. Did the trial court's failure to compel the disclosure of the informant's identity and the amount he was paid deny the defendant due process of law?
3. Was the trial court in error in presuming that the defendant possessed the quantity of narcotics which was seized from his car for sale rather than for personal use?

The following testimony gleaned from the transcript of the motion to suppress is informative regarding the informant's reliability and credibility:

"Q Now, in essence what would—would you relate to the Court exactly what that information was?

A I received a phone call stating that Forest Aikins would be driving his 1969 Ford into the area of 13th Street and McDowell at 4:45 p. m. this date and that he would have in his possession, in the vehicle, a large quantity of heroin.

Q Did this informant tell you how he came by this information?

A Yes, sir.

Q And, how was that?

A He said he had overheard a phone conversation.

Q Is this the only information regarding Mr. Aikens (sic) you had received from this informant?

A No, sir.

Q On how many prior occasions had you received information regarding Mr. Aikins from this informant?

A On several occasions between December of that year up until May when he was arrested.

\* \* \* \* \* \*

Q BY MR. BENNETT: Then approximately how many conversations did you have with your informant prior to May of 1969—excuse me, prior to May 21st of 1969?

A BY THE WITNESS: Conversation. I had conversations with him several times. The amount would have to be an estimate. I really don't keep track, or did not keep track of each conversation.

Q Okay. Then, you said the last conversation prior to Mr. Aikins' arrest was approximately—was at 4:30 p. m. on May 21st?

A Yes, sir.

Q Do you recall your conversation you last had with him prior to that?

A It would have been in May, once again, I would have to estimate. In days, probably—maybe four or five days prior.

Q And, where did this conversation take place, if you can tell us?

A This conversation took place on a street corner in Phoenix.

Q And, was anyone present except yourself and the informant?

A No, sir.

Q And, did this information relate to Mr. Aikins?

A Yes, sir.

Q Would you relate what that information was?

A The information was that he had—Mr. Aikins had picked back up in his activity and that he was dealing freely again, and that there should be some shipments within the next few days.

Q And, when was your conversation prior to that, if there was in fact another conversation prior to that?

A There were several prior to that between, as I stated, December and up until the month of May, just periodically, as the information came in. And, I do not have a record of the dates, or times that this occurred.

Q Was this information relating to Mr. Aikins?

A Yes, sir.

Q Did you do any independent work on your own to try to verify this information?

A Yes, sir, I did.

Q And, have you already related to the Court what that was?

A No, sir, I have not.

Q What work did you do on your own to try to substantiate the information you received?

A Well, the information I received, when I received it, I checked all facets of the information for verification as to names of individuals named, where they were supposed to be living, their background in the dealing of illicit narcotics, their being in Phoenix on given dates and times, and staying in given motels, as I was informed they had stayed in.

That the automobiles that he had, that Mr. Aikins had access to and had been observed driving, I checked out to see if he did have such cars that did fit that license and description, if he did live in the area that he was purported to live in. All of the areas of information that I had any way of checking out, I checked out.

Q Through your independent investigation, were you able to determine whether the information your informant gave you was in fact true?

A Yes, sir.

Q And, was it true or was it false?

A It was true, every name that he had gave me, there was such a person in that area and they did have an extensive background in narcotics. There had been—at the motel this person registered in, there had been phone calls placed back to Portland and Seattle, and the other areas and these phone calls were checked and found to be phone calls to large dealers in those specific areas.

Everything that I was able to check out, checked out true.

\* \* \* \* \* \*

Q Well, did you do anything to determine what kind of a person you were going to use as a reliable individual for information?

A Yes, sir.

Q What did you do?

A I checked out his information that he supplied and found every bit of it to be true.

Q Oh, I see. In other words, when he came to you sometime in January and said to you, 'Mr. Jones from Los Angeles, or wherever he may have been from, is a big dope pusher up there and he was out here at a motel in Phoenix three months ago.' You called, I suppose, Los Angeles, to see if there was such a dope pusher there, is that right?

A Yes, sir.

Q You found out that was true?

A I did.

Q You went out to this motel and found out that such a man had been in the motel at that particular time, is that correct?

A I did, yes, sir.

\* \* \* \* \* \*

Q When is the last time you had any contact with this reliable informant?

A The 21st day of May.

Q When did you pay him?

A Later that evening, I believe.

Q You have never seen him since?

A No, sir, I have made it a point not to see him.

Q Never been used in any other cases?

A No, sir, not by me.

\* \* \* \* \* \*

Q Why was he giving you this information?

A I have no idea.

Q Did you request him to give you any other information that he found out?

A He volunteered the information. I didn't ask him.

Q In other words, everyday he just came in and volunteered information to you, but you never asked him to let you know if he heard anything else?

A I don't recall ever asking him. He just called when he heard it. It was all strictly voluntary.

Q You are swearing under oath, sir, that you do not have a report in which it indicates that this man agreed to obtain any information about Mr. Forrest Aikins?

A He may have. The point I'm making is it wasn't under pressure. He came to me. I did not solicit him out.

Q Did you, after the first interview, ask him to supply you with any information, to furnish you with information about Forrest Aikins? Don't you have a report to that effect, sir?

A I imagine I did. I don't really recall whether I said, 'Furnish it,' or he already gave it.

\* \* \* \* \* \*

Q Now, you therein recite that that confidential reliable informant had proven reliable a minimum of two times in the past.

Do you recall the two occasions on which he proved reliable?

A Yes, sir.

Q What was the first occasion?

A The first occasion was on supplying information which proved to be truthful and beneficial to myself and my organization in the investigation of illicit narcotics traffic.

\* \* \* \* \* \*

Q When did he give that second information to you?

A Within the same span of time.

Q And, what type of information did he give, if different than the information he provided on the first occasion?

A Well, the different subjects, and the the type of drugs they were dealing in, the operation, or how they were dealing.

Q Did you seek a search warrant based on this information given to you the second time?

A No, I did not.

Q Was it the same kind of general background information rather than specifics of time and place and amount, so that you could not seek out a search warrant with the information?

A I set out to verify the information once again and see if there was this type, this type traffic going on and it was later verified, and once again, there was an arrest of the individual.

Q All right. When did that arrest occur?

A Within the same span of time.

Q But, I take it the arrest occurred for information supplied other than this one?

A Yes, I did not make the arrest. It was just proved to me what he had told me was true.

Q All right. Now, had the informant ever provided you with particulars which in your information were sufficient particulars to take to a magistrate and seek a search warrant of

any premises, or any persons that were named?

A I—yes, I feel that this would, be so but as I stated, prior to my getting the information I would need to present to an affidavit to support this information, the arrests were already done."

We are compelled to analyze the fact situation presented to us in the light of a triumvirate of Supreme Court pronouncements which are controlling regarding informants' tips. In Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959), the first of these cases chronologically, the Supreme Court stated that:

"'* * * Probable cause exists where the facts and circumstances within their [the arresting officers] knowledge and of which they have reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed. (citation omitted)." 358 U.S. at 313, 79 S.Ct. at 333.

Draper involved a warrantless search which was held valid where officers received a tip that was detailed, specific, and subsequently proved correct when the events forewarned unfolded according to the informer's premonition.

■ In the next of this group, Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1965), the Supreme Court laid down a two-pronged guideline to be used by an officer in determining probable cause when the facts which have created the apprehension of unlawful conduct were obtained solely from the informant. The requirement is that the informer be credible or reliable and the underlying circumstances upon which the informer based his information be stated. We believe problems have arisen with this test because there has been a question as to whether the informant must measure up to Aguilar's standards independent of his efforts in the case at hand. We are of the opinion that

law enforcement officers are not forestalled from going to the scene and waiting to see if the events unfold as forewarned by the informer. This is the gist of the most recent pronouncement, Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed. 2d 637 (1969), which states that the detailed nature of the information (as required by Draper) may satisfy the Aguilar requirement that there be proof of the underlying circumstances which establish the credibility of the informer, or in the terms of the opinion:

"* * * In the absence of a statement detailing the manner in which the information was gathered, it is especially important that the tip describe the accused's criminal activity in sufficient detail so that the magistrate may know that he is relying on something more substantial than a casual rumor circulating in the underworld or an accusation based merely on an individual's general reputation." 393 U.S. at 416, 89 S.Ct. at 589.

■■ Immediately following this statement the Supreme Court reviewed the tip of an FBI informer in Draper who had not stated the way in which he had obtained his information and had not given any detail regarding the prior criminal activities of Draper, but rather the activity that was to occur in the future at the Denver railroad station on one of two mornings specified. We therefore consider the thrust of the statement in Spinelli to be directed at criminal activity which is to occur, and if it in fact does come to pass in a manner prescribed by the informer, then the manner in which the tip was learned need not be stated unless an agency relationship has evolved between the informer and the law enforcement officials. A lawless search by a private person acting in a private capacity is not in violation of constitutional guarantees. Burdeau v. McDowell, 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1920).

■ Appellant strenuously contends that there is no determination as to whether

the information was obtained by wiretapping or some other devious means because Officer Moody could testify only that the informant had overheard a telephone call. At trial the defense presented testimony by Aikins' business partner and manager and Mr. Jackson, the man telephoned by Aikins, and all asserted that they did not provide information to the enforcement authorities; that they were not aware of any person in the vicinity who could have overheard the call; and that no one had authority to wiretap the phones in question. Appellant contends that this testimony, which we characterize as negative evidence, led to an inference of wiretapping which the State was obliged to rebut. The tacit approval in Spinelli of the Draper tip, which was absent any showing of how the information was received, precludes this argument from having any force or validity without a showing that an agency relationship existed. The appellant has raised the issue as to whether the conduct of the informer was in reality tantamount to being an agent of the police. The manner in which the confidential relationship came about is set out above in the testimony given in the motion to suppress. That evidence points up that the relationship was initiated by the informer and never did approach the kind of conduct which our Supreme Court in State v. Smith, 107 Ariz. 100, 482 P.2d 863 (1971), considered as an agency relationship. In People v. Edwards, 14 Cal.App.3d 57, 92 Cal. Rptr. 91 (1970), there is a succinct statement on the subject which we take the liberty of quoting:

> "The conduct of a private citizen who acts in cooperation with or at the direction of government agents is viewed as a government agent in applying the exclusionary rule. [citation]. On the other hand if a private citizen engages in conduct on his own, which if engaged in by an agent of the government would constitute an unreasonable search and seizure, the exclusionary evidence rule does not prohibit the state from

using the evidence, the fruits of such conduct." 14 Cal.App.3d at 66, 92 Cal. Rptr. at 97.

The court in Edwards, supra, cited People v. Fierro, 236 Cal.App.2d 344, 46 Cal.Rptr. 132 (1965), as an example wherein an appellate court characterized a motel manager named Somner as an agent of the police. Suspecting narcotic activity in his motel, Somner entered Fierro's room while it was unoccupied and found pills. Somner then phoned the Yolo County Sheriff's office and was instructed to return to the room and obtain samples of the pills which were subsequently turned over to the Sheriff, analyzed, and found to have narcotic content. The pills were later used in prosecution. In Fierro the California court held that "official involvement in the lawless quest for evidence was so deep as to involve the exclusionary rule." 46 Cal. Rptr. at 134.

■ We believe the rule that Smith and Fierro are applying in determining agency relationships is that if law enforcement authorities direct, or have knowledge of and condone certain illegal searches, then those citizens who effectuate the search become agents of the state and the fruits are held to be obtained illegally and should be suppressed.

■ In the case at bar there is neither evidence of a wiretap nor evidence that a wiretap was tacitly approved of by any of the law enforcement officers involved in the surveillance.

With reference to the other portion of the Aguilar test, we believe that the informer in this case has proven reliable, not only as a result of the information being true in the instant case, but also from the testimony set out above which clearly illustrated that his information had been checked out and found credible during the months before the arrest in the course of the surveillance of Aikins' home and office.

■■ Appellant's second major contention is that Aikins was denied due process,

specifically the right of confrontation and cross-examination when the trial judge refused to divulge the identity of the informer and the amount paid to the informer. In determining this issue, the U.S. Supreme Court and Arizona courts have previously employed a test which "balancing the public interest in protecting the flow of information against the individual's right to prepare his defense." Roviaro v. United States, 353 U.S. 53, 62, 77 S.Ct. 623, 628, 1 L.Ed.2d 639 (1957), as quoted in State v. Martinez, 15 Ariz.App. 430, 489 P.2d 277 (1971). See also State v. Castro, 13 Ariz. App. 240, 475 P.2d 725 (1970); State v. Snyder, 12 Ariz.App. 142, 468 P.2d 593 (1970), cert. denied 400 U.S. 1001, 91 S.Ct. 475, 27 L.Ed.2d 452 (1970); State v. James, 10 Ariz.App. 394, 459 P.2d 121 (1969). In Martinez Judge Haire stated that "the burden is upon the defendant to make a showing that the informant is likely to have evidence bearing upon the merits of the case and that nondisclosure of his identity would deprive defendant of a fair trial." 15 Ariz.App. at 433, 489 P.2d at 280. Applying this test to the case at bar, we are aided further by State ex rel. Berger v. Hughes, 14 Ariz.App. 107, 481 P.2d 278 (1971), a special action petition in which Judge Stevens stated that it was error for a Superior Court judge to compel disclosure of an informant whose tips had supplied probable cause to arrest and search incident to the arrest because the informant would not be a material witness at the trial on the merits. The reason was that the informant was not present at the stakeout, the search of the automobile, or the seizure of the contraband. We hold that defendant failed to sustain his burden. The interest of the defendant in knowing the name of the informant, and even the possible usefulness of such information, is not the test. State ex rel Berger v. Hughes, supra.

■ Appellant asserts that the amount paid to the informant should have been disclosed. Williamson v. United States, 311 F.2d 441 (5th Cir. 1962), is cited for the proposition that the dangers of payment to an informer by a contingency fee can in some instances be so great as to cause a reversal of the conviction. Williamson was a prosecution for violations of 26 U.S.C. § 5604, subsec. a(1) and 26 U.S.C. § 569, subsec. a, both revenue statutes regulating the distribution of distilled whiskey wherein government agents contracted with a citizen named Moye to pay him $200 to obtain legally admissible evidence against Williamson, and similarly $100 would be paid for evidence against a man named Lowrey. The following testimony of Officer Moody at the motion to suppress conclusively distinguishes the present case from Williamson:

"Q All right. Now, when you took him the money, was he surprised?

A He did not want to accept it.

Q You had never had a discussion about money before?

A No, sir.

Q And, you prevailed upon him to accept it?

A I did, yes, sir."

Appellant's final contention is that the following statement by the trial judge was prejudicial error:

"It is the court's conclusion that a person of the Defendant's character, never before known on the drug scene, a reputable business man in this community, with no indications of use, either from the testimony, or from the observations that the trier of facts has been able to make over the period of a week as we have tried various phases of this matter, as well as the observations that were made sometime ago on the initial testimony on a Motion to Suppress, it is the conclusion of the court that such a person could not be found with quantities of heroin and co-

caine in a compartment in the trunk of his car in such a fashion as he was found, . . . unless he possessed the quantity for sale."

 In this case the trial judge was also the trier of fact and was able to observe the demeanor of witnesses and make reasonable inferences from her observations. We believe, however, that the gist of defendant's argument is keyed to the fact that Aikins was convicted on two counts of possession for sale in violation of A.R.S. § 36–1002.01, notwithstanding the fact that there was no evidence whatsoever of any sale about to take place or of any of the contraband seized. Furthermore, neither the law enforcement officers nor the informants who were conducting a surveillance of Aikins had ever seen a transaction involving narcotics undertaken by the defendant. There was evidence at trial that the narcotics were found in the trunk of a car which was registered in defendant's name. Constructive possession can be assumed from the evidence that narcotics were found in a car owned by, registered to, and driven by defendant at the time of arrest. See State v. Arce, 107 Ariz. 156, 483 P.2d 1395 (1971). Constructive possession is all that is required in order to sustain a conviction of possession for sale of narcotics. State v. Arce, supra. Furthermore, circumstantial evidence regarding the quantity of contraband found in the possession of defendant, its packaging, the secret compartment in which it was discovered, all can be taken into account in convicting for possession for sale. State v. Arce, supra. The large quantity of heroin and cocaine found in two Awake orange juice cans placed in a green ammunition box in a specially built compartment of an automobile trunk are circumstances that can reasonably be taken into consideration in a conviction for possession for sale.

The judgment of conviction and sentence imposed thereon are affirmed.

STEVENS, P. J., and CASE, J., concur.