[Crim. No. 11310. Second Dist., Div. Four. Apr. 26, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. ROBERT
LᴇROY BOTTS, Defendant and Appellant.

Ferdinand F. Fernandez, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Howard J. Bechefsky, Deputy Attorney General, for Plaintiff and Respondent.

KINGSLEY, J.—Defendant was charged with possession of heroin, in violation of section 11500 of the Health and Safety Code. One prior felony conviction was alleged. He pled not guilty and denied the prior. After a trial by the court (trial by jury having been duly waived) he was found guilty and the prior conviction was found to be true. Proceedings were suspended and proceedings were commenced under the Narcotic Rehabilitation Act, resulting in defendant's commitment to that program. Thereafter, defendant was discharged from the Rehabilitation Center pursuant to habeas corpus proceedings instituted on his behalf. The criminal proceedings were resumed, probation was denied and he was sentenced to state prison. He has appealed.

Witness Carr, a service station attendant, observed some men park a car on the service station lot. Defendant left the car and entered the restroom of the station. Carr went to a back room of the station to a point from which he was able to see into the restroom through two three-quarter inch holes in the wall. Carr testified that the holes had resulted when, previously, a towel rack had been removed from the restroom side of the wall. Carr observed defendant with a hypodermic syringe on the top of the toilet, and with a white paper which he removed from his wallet. Carr reported his observation to his father and then returned to look into the restroom again. In the meantime another man had left the parked car and gone into the restroom. Carr was unable to see more because the holes had been plugged up from the inside with toilet

tissue. Shortly thereafter, defendant and his companion left the restroom and the car drove off.

Carr reported his observations to nearby police officers. Officer O'Rourke, on the basis of this information, followed the Ford and stopped it on San Antonio between Gaviota and Rose. Three men got out. Defendant had a belt around his neck. Defendant was arrested and, during the search, the officer found a piece of tissue and a rolled matchbook cover, a piece of thin wire and a bobbypin. It is stipulated that Gerald Eaton testified that he found a hypodermic syringe on the corner of San Antonio and Gaviota on September 13, 1961. On the ground two or three inches from defendant's shifting right foot an officer found a spoon depressed into the earth with a bent handle. Defendant had a handkerchief with blood on it in his pocket. An officer found, under the driver's seat, a half-spoon, some thread, a needle in a plastic case, and an eyedropper, all wrapped in a dirty cloth. The bowl of the spoon was blackened and it contained heroin residue. On the rear floor of the car another officer found the top to a condom, and then he found a condom containing 85 capsules of white substance which later proved to be heroin. It was stipulated that defendant was under the influence of heroin shortly before the car was stopped.

The testimony for the defense was that witness Bennett and defendant had been employed at the same place some time before. Bennett had been laid off and, on the day in question, had gone with witness Sweeton to visit defendant in the hope that defendant could assist Bennett to become re-employed. Unknown to Bennett, defendant had also been laid off. The three men decided to go for a drive. Defendant had had a "fix" of heroin shortly before the visit. While driving, he felt the need to go to a restroom and they had stopped at Carr's station for that purpose. Because defendant was in the restroom a long time, Sweeton went in to "hurry him up." The chase and arrests followed. Sweeton testified that the narcotics found were his, and that he had given them to Bennett to dispose of when he saw the police following them. He testified that defendant was unaware of the narcotics. Defendant denied using heroin in the restroom. He testified that he had cut his finger earlier and wiped it on his handkerchief and that, while in the restroom, he realized that his "kit" was in his pocket and had tried to unclog it there.

Defendant contends: (1) the testimony of Carr should have been excluded because it was based on an unreasonable search

and seizure; (2) the admission made by defendant violated his constitutional rights (*People* v. *Dorado* (1965) 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]); (3) the defendant was convicted because the trial court erroneously believed possession could be based on prior use of narcotics that day; (4) the evidence is insufficient to support the verdict; and (5) it is unconstitutional to conduct proceedings under Penal Code section 6451 and later under Health and Safety Code section 11500.[1]

I

■ Defendant argues that Carr's testimony should have been excluded as it was based on observations amounting to an unreasonable search and seizure.[2] Defendant is correct in his assertion that, if the acts committed by Carr had been committed by a police officer, the evidence obtained would have been inadmissible. (*Bielicki* v. *Superior Court* (1962) 57 Cal.2d 602 [21 Cal.Rptr. 552, 371 P.2d 288].) Defendant also correctly asserts that, if Carr was acting as an agent of the state, his testimony would have been excluded. (*People* v. *Tarantino* (1955) 45 Cal.2d 590 [290 P.2d 505].) In the case at Bench, Carr was neither a policeman nor was he an agent of the police; in the *Tarantino* case the agent worked under police supervision; no such suggestion is made here.[3]

However, where the challenged evidence was obtained by a private citizen, acting on his own, the cases have refused to apply any exclusionary rule. (*Burdeau* v. *McDowell* (1921)

---

[1] It was stipulated that the police officers had reasonable cause to stop the car and that their actions in searching and seizing evidence thereafter were lawful.

[2] The Attorney General argues that this issue was not properly raised at the trial and, therefore, is not properly before us on this appeal. However, since we must reverse for another reason hereinafter set forth, and since the admissibility of the Carr testimony will almost certainly arise on a retrial, we think it appropriate to discuss its admissibility for the guidance of the trial court and counsel on such new trial.

[3] *Corngold* v. *United States* (9th Cir. 1966) 367 F.2d 1, relied on by defendant, is in the same class as is *Tarantino*, since the private search was made at the request and instigation of the federal officers. See, also: *People* v. *Fierro* (1965) 236 Cal.App.2d 344 [46 Cal.Rptr. 132].

Also inapposite to the present case are those cases where, although the search was made by a private citizen, he was accompanied and directed by the police. See: *State* v. *Scrotsky* (1963) 39 N.J. 410 [189 A.2d 23]; *Moody* v. *United States* (Dist. Col. 1960) 163 A.2d 337.

Defendant also relies on *Gambino* v. *United States* (1927) 274 U.S. 310 [72 L.Ed. 293, 48 S.Ct. 137, 52 A.L.R. 1381]. But in *Gambino* the action was taken for the express purpose of securing evidence to be turned over to federal law enforcement officials. No such motivation appears here.

256 U.S. 465 [65 L.Ed. 1048, 41 S.Ct. 574, 13 A.L.R. 1159]; *People* v. *Randazzo* (1963) 220 Cal.App.2d 768 [34 Cal.Rptr. 65], cert. den., 377 U.S. 1000 [12 L.Ed.2d 1050, 84 S.Ct. 1933]; *People* v. *Trimarco* (1963) 41 Misc.2d 775 [245 N.Y.S.2d 795].) While it is true that *Burdeau* is now somewhat questionable as an authority, since it can be regarded as being an application of the "silver platter" doctrine later repudiated in *Elkins* v. *United States* (1960) 364 U.S. 206 [4 L.Ed.2d 1669, 80 S.Ct. 1437],[4] the two state cases are not subject to that caveat.

On principle, we think that the application of an exclusionary rule to evidence obtained by a private citizen, not acting as a police agent, is unwarranted.

"In applying the exclusionary rule to evidence acquired through improper searches by government officials the Supreme Court has emphasized that the rule is 'calculated to prevent, not to repair. Its purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it.' [*Elkins* v. *United States* (1960) 364 U.S. 206, 217 [4 L.Ed.2d 1669, 1677; 80 S.Ct. 1437, 1453].] Because police will alter their investigatory practices to secure future convictions, the rule clearly is an appropriate means to deter improper police conduct. A rule of exclusion would serve no function, however, in situations where its application would not deter improper searches in the future." Note, *Seizures by Private Parties: Exclusion in Criminal Cases* (1967) 19 Stan.L.Rev. 608, 610-611.)

Where an exclusionary rule is directed to the police, we may assume that they will have knowledge of it, that there will result directives from the higher echelons designed to secure compliance and to institute acceptable alternative practices, and that both the discipline of an organized police force and the desire to secure convictions will produce compliance with those directives. But, except in unusual cases, we cannot assume that private citizens will be aware of an exclusionary rule, that they will be under any disciplinary compulsion to obey such a rule, nor that they will not be motivated in their conduct by reasons apart from, or in addition to, a desire to assist in securing a criminal conviction. The result of applying an exclusionary rule to cases such as the one at Bench would be to free a guilty man without any assurance

---

[4]See the discussion of this point in the Note in (1967) 19 Stan.L.Rev. 608, 610.

that there would result any counterbalancing restraint of similar conduct in the future.

Relying on *Shelley* v. *Kraemer* (1948) 334 U.S. 1 [92 L.Ed. 1161, 68 S.Ct. 836, 3 A.L.R.2d 441], defendant argues that the use of privately obtained evidence at the criminal trial is governmental action, and that an exclusionary rule would operate to deter such governmental action. But the analogy is not apt. In *Shelley* v. *Kraemer*, the antisocial conduct—the racial discrimination—would have followed, and would have become operative only because of and after, the state action in entering a judgment in a law suit. But in the case at Bench, the objectionable conduct had occurred prior to, and was not dependent for its antisocial effect on, any later governmental action; the citizens' right of privacy had been violated, whether or not anyone in a courtroom talked about his actions.

It may well be that the bathroom is becoming the last sanctuary of privacy in an increasingly Orwellian society, but that sanctuary must be protected by devices which do not create a certainty of the social evil of ineffective law enforcement balanced only by a highly problematical and uncertain efficacy of social protection. The Carr testimony was properly admitted.

## II

■ Defendant argues that his admissions were improperly entered into evidence. ■ At the time of making the admissions, the defendant was in custody at the Narcotics Bureau and had been arrested two hours earlier. The officers had entered into a process of interrogation tending to elicit incriminating statements, and the inquiry had focused on defendant as a prime suspect. Therefore, the police had a duty to warn defendant of his right to remain silent and have an attorney (*People* v. *Dorado* (1965) 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]), and failure to do so was error.

■ Where the record is silent, as here, we cannot presume that adequate warning was given. (*People* v. *Stewart* (1965) 62 Cal.2d 571 [43 Cal.Rptr. 201, 400 P.2d 97].) However, where statements are not confessions, automatic reversal is not required. (See *People* v. *Luker* (1965) 63 Cal.2d 464, 475 [47 Cal.Rptr. 209, 407 P.2d 9].) Therefore, it becomes necessary to examine whether or not the admissions were harmless in leading towards his conviction.

Defendant admitted the following: That, prior to his

meeting his two friends, he had injected heroin in himself, that he was using about two caps to a half a gram, that the needle holster and needle cleaner found on him were his spike holder and spike cleaner, that he threw the narcotic paraphernalia out of the car window and that he was on parole for a marijuana conviction.

We conclude that the error was prejudicial. Although Carr saw the defendant doing something with a hypodermic needle, he did not see him with narcotics, or engaged in injecting himself. A codefendant testified that Botts had neither knowledge or possession of the narcotics discovered. Defendant's admissions, especially that he had taken the narcotic kit on the drive, coupled with his admission of being a user and of having had a recent "fix," cannot have been other than damaging to his defense.

### III

Defendant argued that the trial court erroneously believed that use of narcotics on the day in question but prior to the ride was sufficient to convict defendant of possession. It is not at all certain from the language cited to us that the trial court believed that mere use of narcotics on the day in question would be sufficient to sustain a conviction. There is also a great deal of other language indicating that the court believed defendant had heroin in the restroom. Where the judge's statement as a whole discloses a correct concept of the law no secondary remark should be deemed to have impeached his determination. (*People* v. *Cartier* (1960) 54 Cal.2d 300, 313 [5 Cal.Rptr. 573, 353 P.2d 53].) To support a charge of possession, it must be shown that the accused was aware of the presence of the narcotic (*People* v. *White* (1964) 231 Cal.App.2d 82 [41 Cal.Rptr. 604]), and he must have dominion and control over the narcotic (*People* v. *Gory* (1946) 28 Cal.2d 450, 455 [170 P.2d 433]). In the case at Bench we have more than proximity, more than presence of paraphernalia, and more than being under the influence of a narcotic. We have the inference created by the belt around defendant's neck at the time of the arrest and the inference from the testimony of Carr that defendant had a hypodermic needle in the restroom and was fixing it. These inferences are sufficient evidence to support a charge of possession either at the gas station or in the car.

### V

Defendant argues, for purposes of preserving his rights in higher courts, that his constitutional rights were violated

when he was first committed under Penal Code section 6451 and later under Health and Safety Code section 11500. However, defendant admits that the arguments he would have made have been considered and decided adversely to him in *In re De La O* (1963) 59 Cal.2d 128 [28 Cal.Rptr. 489, 378 P.2d 793, 98 A.L.R.2d 705].

Because of the improper admissions of statements made by defendant after his arrest, the judgment is reversed.

Files, P. J., and Jefferson, J., concurred.