[Crim. No. 15379. In Bank. Sept. 13, 1972.]

THE PEOPLE, Plaintiff and Appellant, v.
LLOYD GEORGE McKINNON et al., Defendants and Respondents.

900

### COUNSEL

Edwin L. Miller, Jr., and James Don Keller, District Attorneys, Richard H. Bein and Terry J. Knoepp, Deputy District Attorneys, for Plaintiff and Appellant.

Hecsh, Hegner & Philbin, Michael S. Hegner, Woolley, Crake, Collins & Ward and William O. Ward III for Defendants and Respondents.

### OPINION

**MOSK, J.**—In this typical air freight search case we are called upon to reconsider *People* v. *McGrew* (1969) 1 Cal.3d 404 [82 Cal.Rptr. 473, 462 P.2d 1], and *Abt* v. *Superior Court* (1969) 1 Cal.3d 418 [82 Cal.Rptr. 481, 462 P.2d 10], in the light of supervening developments in the law. As will appear, we conclude that the rule of those decisions is no longer to be followed, and that a chattel consigned to a common carrier for ship-

ment may lawfully be searched upon probable cause to believe it contains contraband.

Defendants Lloyd George McKinnon and John Scott Turk were charged with transporting marijuana (Health & Saf. Code, § 11531) and possession of marijuana for sale (Health & Saf. Code, § 11530.5). Both defendants filed motions to suppress the evidence on the ground of illegal search and seizure. (Pen. Code, § 1538.5.) The court granted the motions, dismissed the charges as to McKinnon (Pen. Code, § 1385), and set aside the information as to Turk (Pen. Code, § 995). The People appeal. (Pen. Code, § 1238, subds. (a)(1) and (a)(7).)

The matter was submitted on the transcript of the preliminary examination. Mitchell Gos, an air freight agent, testified that on March 10, 1969, McKinnon and Turk brought five cardboard cartons to the United Airlines freight counter at the San Diego airport. McKinnon stated he wished to ship the cartons to Seattle; he described the contents as "personal effects," and gave the name "L. McKinnon" of "Balboa Supply Company" as the consignor and "L. McKinnon" as the consignee. Turk assisted in providing the information entered on the air bill.

Gos had not seen either man before, but suspected that the cartons contained contraband. After defendants left, Gos asked a fellow employee to note the make and license number of their car. He then obtained his supervisor's permission to open one of the cartons for purposes of inspection. In the presence of the supervisor and other employees, Gos slit the tape on one of the cartons and put his hand inside. Beneath some paper he felt brick-shaped packages of what seemed to be soft tobacco or grass. He then lifted the lid of the carton, took out one of the packages, and pinched it open. Upon finding that it contained what he believed to be marijuana, he telephoned the police.

In response to the call, Officer McLaughlin of the State Bureau of Narcotics Enforcement arrived at the air freight counter 20 or 30 minutes later. He looked at the air bill, then entered a back room where the cartons had been placed. The carton that Gos had inspected stood open on the floor; it contained a large brown plastic bag, which was also open. As Officer McLaughlin approached the carton, he saw inside a number of brick-shaped packages wrapped in red cellophane. Each was 10 to 12 inches long, about 6 inches wide, and 2 to 3 inches thick. Officer McLaughlin formed the opinion that the substance in the packages was marijuana. He proceeded to open one of the packages, and verified its contents.

Officer McLaughlin next learned that a passenger by the name of "L. McKinnon" had a reservation on a flight due to leave for Seattle within

the hour. He obtained from Gos a description of the two men who had presented the cartons for shipment, together with the make and license number of their car. Shortly afterward Officer McLaughlin located the car in the parking lot, and arrested Turk as he entered it. The officer then returned to the departure area and arrested McKinnon on board a United Airlines flight waiting to take off for Seattle.

Promptly after making the arrests Officer McLaughlin opened the remaining four cartons. Each contained, like the first, 10 identical "kilo" bricks of marijuana, making a total of 50. The parties stipulated at the hearing that this constituted a "commercial quantity" of marijuana.

The defense was directed primarily to establishing the proposition that Gos was acting as an agent of the police when he opened the first carton presented by defendants. Gos testified that on four or five occasions during the preceding three years he had opened packages consigned for shipment as air freight and had found marijuana, and in that connection had called Officer McLaughlin or other law enforcement personnel. He denied, however, that the police had instructed him to open such packages. He explained that by virtue of a regulation of the Civil Aeronautics Board he was entitled to open any shipment for purposes of inspection, and that he does so, among other reasons, to forestall fraudulent insurance claims.[1] His only instructions were from his company, directing him to obtain his supervisor's permission before opening a package; after that, it was company policy to notify the police if anything suspicious was found.

Gos further testified that it was his practice, if he found contraband in a package, to leave the package open so that when the police arrive "there is no cause for illegal search or seizure." He again denied he had been instructed to do so by the police. Instead, he explained that in a case three years earlier he had obtained police assistance in opening for inspection a pair of trunks secured by combination locks. Called to testify in that case, he learned that contraband found in the trunks was inadmissible because of the police participation in opening them. He discussed this and similar rulings with his fellow employees, and thereafter made it his practice simply to leave open any package that he found upon inspection to contain contraband.

Officer McLaughlin took the stand and acknowledged he had talked on various occasions with Gos and other airline employees, but denied

---

[1]Thus Gos testified, "I get all kinds of people coming over that counter and I am kept busy and people tell me they are sending electronic equipment and claim big insurance . . . and it is all personal effects just to get insurance . . . happens all the time, . . ."

ever having instructed them to open any packages or to leave them open for police examination. He testified his sole request to such employees was that they promptly contact him or some other law enforcement agency if they became suspicious of any person shipping goods or of the goods themselves.

The sole defense witness was Etta Durden, a legal secretary. At defense counsel's instigation Miss Durden had interviewed Gos a few days before the hearing, posing as a student doing research for a paper allegedly on the subject of preventing the transportation of marijuana. She testified that Gos told her the police had asked him and his fellow freight agents to "be alert" for suspicious persons or packages, and if their suspicions were aroused "they open the box and if there is any contraband in it, they leave it open and call the police." According to Miss Durden, Gos explained that such suspicions may be caused by unusual appearance or conduct of the individual, a distinctive odor emanating from the package, or a discrepancy between the weight of the package and the weight it would have if it contained the articles claimed. Finally, Miss Durden testified Gos also told her that on a few occasions the police asked him to be on the lookout for particular named individuals.

After detailed arguments on the point, the court at the preliminary hearing made a specific finding of fact that Gos was not acting as an agent of the police when he opened the carton in question.[2]

I

Inasmuch as Officer McLaughlin proceeded without benefit of a search warrant, the burden was on the prosecution to show proper justification for the search. (*Badillo* v. *Superior Court* (1956) 46 Cal.2d 269, 272 [294 P.2d 23].)

The record discloses that the various rulings of the courts below were directly responsive to the progress of an appeal in a closely similar case, *People* v. *McGrew*. There the defendant brought a new footlocker to the United Airlines freight counter at the San Diego airport, to be shipped to San Francisco. The employee on duty, one Dowling, became suspicious because of McGrew's general appearance and the apparently exceptional weight of the locker, which McGrew declared contained books and cloth-

---

[2]The court stated, "I am not satisfied he is an agent. I haven't heard any evidence here setting forth that he did it at the direction of the Police Department or any law enforcement agent. I listened very carefully for that and I listened to what he had to say and what the young woman had to say and I can't find that he is an agent of any law enforcement agency."

ing. At the direction of his supervisor, Dowling opened the locker by knocking out the hinge pins. Inside, he observed several bricks or packages wrapped in brown paper or newspaper. He closed the lid and called the police. When an officer arrived, Dowling reopened the locker and showed him the contents. The officer inspected one of the packages, and a narcotics agent decided they contained marijuana. The police then removed all but one package, replacing them with ballast.

Dowling notified other airlines about McGrew and his shipment. A few hours later McGrew brought a second footlocker to the Western Airlines freight counter, saying it contained books and dishes. The Western employees alerted the police, and the same narcotics agent responded. Although the locker had not been opened, by compressing the lid the agent detected an odor of marijuana. At his request, the airline employees then opened the locker by knocking out the hinge pins. The contents were bricks of marijuana wrapped in brown paper. McGrew was arrested some two hours later in the airport restaurant; a suitcase he had checked was also found to contain marijuana.

The trial court granted McGrew's motion to suppress the evidence on the ground of illegal search and seizure, and dismissed the charges. On the People's appeal the Court of Appeal held the evidence admissible, and reversed. (*People* v. *McGrew* (Cal.App. 1969) 75 Cal.Rptr. 378.)

In the case at bar, the magistrate at the preliminary hearing relied on the Court of Appeal decision in *McGrew* in overruling defendants' objections to the admission of the marijuana evidence.

We subsequently granted a hearing in *McGrew*, and contrary to the Court of Appeal decision, affirmed the order of dismissal. (*People* v. *McGrew* (1969) *supra*, 1 Cal.3d 404.) In an opinion by a sharply divided court, the majority held that the search of the footlockers did not fall within any of the doctrinal exceptions to the warrant requirement of the Fourth Amendment. A similar ruling was made in the companion case of *Abt* v. *Superior Court* (1969) *supra*, 1 Cal.3d 418.

In the case at bar, defendants' pretrial motions to suppress came on for hearing shortly after the decisions of this court in *McGrew* and *Abt*. The deputy district attorney candidly advised the court that the facts were "quite similar" to those of *McGrew*, and submitted the matter without attempting to distinguish that authority. The court agreed the case was governed by the rule of *McGrew* and *Abt*. Observing that "I am controlled by the law as it is, not as it was or will be," the court with apparent reluctance ruled that the evidence must be suppressed.

While this case was pending on appeal, however, the United States Supreme Court rendered its decision in *Chambers* v. *Maroney* (1970) 399 U.S. 42 [26 L.Ed.2d 419, 90 S.Ct. 1975]. As we shall explain, we conclude that under the rationale of *Chambers* the evidence here challenged was the product of a constitutionally reasonable search.

The basis of the majority's holding in *McGrew* was the general rule that probable cause to believe contraband will be found concealed in certain property does not justify a warrantless search that is neither consensual nor incident to a lawful arrest, "absent an emergency." (1 Cal.3d at p. 409.) Such an emergency arises when there is an imminent danger that the property to be searched may be removed or the contraband destroyed. (*Ibid.*) The majority held that exception inapplicable to the facts of *McGrew,* reasoning (at p. 410) there was no "likelihood that the lockers would be removed or the contraband destroyed; both footlockers were safely in the custody of the airlines. Both footlockers had been shipped on a 'space available' basis, so that the airlines were not even under a contractual obligation to ship the footlockers before a warrant could be obtained." As the officers had time to procure such a warrant but did not do so, the majority concluded, their search of the lockers was ipso facto "unreasonable" within the meaning of the Fourth Amendment.

In *Chambers* v. *Maroney,* however, the United States Supreme Court rejected that same line of reasoning in the context of an automobile search. There a service station was robbed by two armed men, and eyewitness descriptions of their appearance and the getaway car were broadcast over police radio. Within an hour the robbers' vehicle was stopped on the highway by the police. The occupants were arrested, but the car was not searched at the scene. Instead, it was driven to the police station, where a later search revealed weapons and incriminating evidence hidden under the dashboard.

Affirming a denial of federal habeas corpus after convictions of robbery, the United States Supreme Court held (1) that the police had probable cause to arrest the defendants for robbery, (2) that the search of the defendants' car cannot be justified as an incident to that arrest because it was conducted at a different time and place, but (3) that the search was nevertheless reasonable because of the distinguishing characteristic of mobility possessed by the property in question, an automobile. The court began by observing (399 U.S. at p. 48 [26 L.Ed.2d at p. 426]) that "In terms of the circumstances justifying a warrantless search, the Court has long distinguished between an automobile and a home or office." The court referred at length to its leading decision of *Carroll* v. *United States* (1925) 267 U.S. 132 [69 L.Ed. 543, 45 S.Ct. 280], in which it held that because of their

highly movable nature "automobiles and other conveyances may be searched without a warrant in circumstances that would not justify the search without a warrant of a house or an office, provided that there is probable cause to believe that the car contains articles that the officers are entitled to seize." (399 U.S. at p. 48 [26 L.Ed.2d at p. 426].)

After emphasizing that *Carroll* remains living law today, the *Chambers* court faced the question whether a different result was required in the case before it because the officers searched the defendants' car not at the time and place it was stopped but later at the police station. The distinction was held to be without constitutional significance: "Arguably, because of the preference for a magistrate's judgment, only the immobilization of the car should be permitted until a search warrant is obtained; arguably, only the 'lesser' intrusion is permissible until the magistrate authorizes the 'greater.' But which is the 'greater' and which the 'lesser' intrusion is itself a debatable question and the answer may depend on a variety of circumstances. *For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant.* Given probable cause to search, either course is reasonable under the Fourth Amendment. . . . The probable-cause factor still obtained at the station house and so did the mobility of the car unless the Fourth Amendment permits a warrantless seizure of the car and the denial of its use to anyone until a warrant is secured. In that event *there is little to choose in terms of practical consequences between an immediate search without a warrant and the car's immobilization until a warrant is obtained.*" (Italics added; fn. omitted.) (*Id.* at pp. 51-52 [26 L.Ed.2d at pp. 428-429].)

In the case at bar we must determine whether the rationale of *Chambers* should be limited to searches of automobiles and similar self-propelled "vehicles" such as trucks, trains, boats, or airplanes. Neither reason nor precedent compels such a narrow, mechanistic reading of *Chambers* and its predecessors. *Carroll* itself was based in part on the historical example of warrantless seizures of contraband "goods in the course of transportation." (267 U.S. at p. 149 [69 L.Ed. at p. 549].) After a detailed review of the early statutes on the subject, the court concluded (at p. 151 [69 L.Ed. at p. 550]) that "contemporaneously with the adoption of the Fourth Amendment we find in the first Congress, and in the following Second and Fourth Congresses, a difference made as to the necessity for a search warrant between goods subject to forfeiture, when concealed in a dwelling house or similar place, and like goods in course of transportation and concealed in a movable vessel where they readily could be put out of

reach of a search warrant." Even more broadly, the court said in *Preston* v. *United States* (1964) 376 U.S. 364, 366 [11 L.Ed.2d 777, 780, 84 S.Ct. 881], that "Common sense dictates, of course, that questions involving searches of motorcars or *other things readily moved* cannot be treated as identical to questions arising out of searches of fixed structures like houses." (Italics added.) And in *Cooper* v. *California* (1967) 386 U.S. 58, 59 [17 L.Ed.2d 730, 732, 87 S.Ct. 788], the court cited *Preston* for the proposition that because cars are "constantly movable" they may be searched with probable cause but without a warrant "although the result might be the opposite in a search of a home, a store, or *other fixed piece of property*." (Italics added.)

Is a box or trunk consigned to a common carrier for shipment to a remote destination a "thing readily moved" or a "fixed piece of property"? The answer, self-evidently, is the former. To be sure, such a box has neither wheels nor motive power; but these features of an automobile are legally relevant only insofar as they make it movable despite its dimensions. A box, which is a fraction of the size and weight of an automobile, is movable without such appurtenances. It is also true that a box or trunk, as distinguished from an automobile, may serve the double purpose of both storing goods and packaging them for shipment. But whenever such a box is consigned to a common carrier, there can be no doubt that it is intended, in fact, to be moved.

What is true of a box or trunk is true of all goods or chattels consigned to a common carrier for shipment. As they are no less movable than an automobile, the reasons for the rule permitting a warrantless search of a vehicle upon probable cause are equally applicable to the search of such a chattel.[3] In the language of the United States Supreme Court decisions, "common sense dictates" that when the police have probable cause to believe a chattel consigned to a common carrier contains contraband, they must be entitled either (1) to search it without a warrant or (2) to "seize" and hold it until they can obtain a warrant; absent these remedies, the chattel will be shipped out of the jurisdiction or claimed by its owner or by the consignee. *Chambers* teaches us, however, that in those circumstances there is no "constitutional difference" between the alternatives thus facing the police: an immediate search without a warrant, says the *Chambers* court, is no greater an intrusion on the rights of the owner than immobilization of the chattel until a warrant is obtained, and "either

---

[3]This rule does not apply to first class mail, which has historically been accorded special treatment by the United States Supreme Court. (See. e.g., *United States* v. *Van Leeuwen* (1970) 397 U.S. 249, 251-252 [25 L.Ed.2d 282, 284-285, 90 S.Ct. 1029].)

course is reasonable under the Fourth Amendment." (399 U.S. at p. 52 [26 L.Ed.2d at p. 428].)

Finally, contrary to the reasoning of the majority of this court in *McGrew* (at p. 410 of 1 Cal.3d), we learn from *Chambers* there is no constitutional relevance to the fact that a chattel consigned to a common carrier—such as the cartons in the case at bar—is temporarily entrusted to the "custody" of the carrier. In *Chambers* the defendants' automobile was seized by police officers and impounded at the police station; if the high court can say, as it does, that under those circumstances "the mobility of the car" still obtained *at the station house* (399 U.S. at p. 52 [26 L.Ed.2d at p. 428]), a fortiori a chattel such as here involved remains "mobile" in the constitutional sense despite its limited and voluntary bailment to a common carrier.

Fairly construed, the reasoning of the United States Supreme Court in *Chambers* thus undermines the foundation of the majority opinions in *McGrew* and *Abt*. (Accord, *People* v. *Superior Court (Evans)* (1970) 11 Cal.App.3d 887, 893 [90 Cal.Rptr. 123].) For these reasons, *McGrew* and *Abt* are no longer to be followed.

We are not unmindful of the recent decision of the United States Supreme Court in *Coolidge* v. *New Hampshire* (1971) 403 U.S. 443 [29 L.Ed.2d 564, 91 S.Ct. 2022]; properly considered, however, we do not interpret that decision to affect the impact of *Carroll* and *Chambers* on *McGrew* and *Abt*.

First, *Coolidge* is distinguishable on its facts. After arresting a murder suspect in his house, the police seized his automobile and searched it later at the police station, finding physical evidence that the victim had been inside the vehicle. Rejecting a contention that there were "exigent circumstances" to justify the search and seizure without a valid warrant, the plurality opinion of Justice Stewart emphasized the following facts: "In this case, the police had known for some time of the probable role of the Pontiac car in the crime. Coolidge was aware that he was a suspect in the Mason murder, but he had been extremely cooperative throughout the investigation, and there was no indication that he meant to flee. He had already had ample opportunity to destroy any evidence he thought incriminating. There is no suggestion that, on the night in question, the car was being used for any illegal purpose, and it was regularly parked in the driveway of his house. The opportunity for search was thus hardly 'fleeting.' The objects that the police are assumed to have had probable cause to search for in the car were neither stolen nor contraband nor dangerous." (*Id.* at p. 460 [29 L.Ed.2d at p. 579].)

Here, in sharp contrast, law enforcement authorities had not "known for some time" of the existence or probable contents of the five cartons presented by defendants for shipment; although defendants were not deliberately fleeing, both were departing from the premises and one was already on board an airplane preparing to fly out of the jurisdiction; the cartons were not resting on private property, but had been consigned to a common carrier for transportation to a remote destination; and there was probable cause to believe (see Part III, *post*) that the cartons were being "used for an illegal purpose" in that they contained not "mere evidence" but contraband. Each of these factors was specifically found to be lacking in *Coolidge;* measured by the high court's own standards, therefore, the opportunity to search in the case at bar was much more "fleeting"—and prompt action was far more imperative—than in *Coolidge.*

Second, that portion of Justice Stewart's plurality opinion (Part II B, 403 U.S. at pp. 458-464 [29 L.Ed.2d at pp. 578-581]) which purports to narrow the *Carroll-Chambers* rule was in any event signed by only four members of the court (Stewart, J., Douglas, J., Brennan, J., and Marshall, J.). Although concurring in the judgment, Justice Harlan declined to join in Part II B of the opinion (see *id.* at p. 491 [29 L.Ed.2d at p. 597]), and the four remaining justices expressly disagreed with Justice Stewart on this point (*id.* at p. 504 [29 L.Ed.2d at p. 605], dissenting opn. by Black, J., joined by Burger, C.J., and Blackmun, J.; *id.* at p. 525 [29 L.Ed.2d at p. 617], dissenting opn. by White, J., joined by Burger, C.J.). ██ It follows that the *Carroll-Chambers* issue raised by the plurality opinion in *Coolidge* was in fact considered by an equally divided court, and hence was not actually *decided:* under settled doctrine, the judgment of an equally divided United States Supreme Court "is without force as precedent." (*Eaton* v. *Price* (1960) 364 U.S. 263, 264 [4 L.Ed.2d 1708, 1709, 80 S.Ct. 1463].) Thus we are bound to apply the *Carroll-Chambers* rule according to our present understanding of its scope.

## II

██ Turning to the facts of the case before us, we find it undisputed that the carton opened by Gos was a chattel consigned to a common carrier for shipment. The dispositive question, therefore, is whether there was probable cause to believe the carton contained contraband.

To begin with, it is not necessary that the airline employee himself have such probable cause unless he is chargeable with acting as a police agent in opening the shipment. ██ "The conduct of a person not acting

under the authority of a state is not proscribed by the Fourth or Fourteenth Amendments of the federal Constitution. There are no state standards for 'search and seizure' by a private citizen who is not acting as an agent of the state or other governmental unit. Therefore, acquisition of property by a private citizen from another person cannot be deemed reasonable or unreasonable" within the meaning of the constitutional provisions. (*People* v. *Superior Court (Smith)* (1969) 70 Cal.2d 123, 128-129 [74 Cal.Rptr. 294, 449 P.2d 230], and cases cited.) Whether an airline employee acts as an agent of the police is, of course, a question of fact, but some guidelines have emerged from the reported decisions in related cases.[4]

First, it is evident that the conduct of an airline employee who was hired and paid by the police to search any and all suspicious packages in the hope of finding evidence of crime would be judged by Fourth Amendment standards. (*People* v. *Tarantino* (1955) 45 Cal.2d 590, 595 [290 P.2d 505].) The same would be true of the conduct of an airline employee who, although not in the actual hire of the police, nevertheless participated in planning and implementing a "joint operation" with law enforcement authorities for the purpose of obtaining incriminating evidence against a specific person. (*Stapleton* v. *Superior Court* (1968) 70 Cal.2d 97, 100-102 [73 Cal.Rptr. 575, 447 P.2d 967].) And even though he had no prior arrangement with the police, an airline employee would be deemed to act as an agent thereof if he were to open and search a specific package at the express direction or request of law enforcement authorities. (*People* v. *Fierro* (1965) 236 Cal.App.2d 344, 347 [46 Cal. Rptr. 132].) None of these situations, however, is presented in the case at bar.

An alternate ground of our holding in *Stapleton* was that in appropriate circumstances a private citizen may also be deemed to act as an agent of the police when the latter merely "stand silently by," i.e., when they knowingly permit the citizen to conduct an illegal search for their benefit and make no effort to protect the rights of the person being searched. (70 Cal.2d at pp. 102-103.) This rule forestalls belated police claims that they did not actually "direct" or "request" their lay associate to undertake the illegal search, and thereby prevents them from doing indirectly —by silent but unmistakable approval—what they cannot constitutionally do directly.

In the peculiar context of searches by airlines or other common carriers,

---

[4]This question was expressly left open in both *McGrew* (1 Cal.3d at p. 409) and *Abt* (*id.* at p. 421). The analysis we now adopt requires that it be reached and resolved.

however, the foregoing rule would appear to have little if any application. First, it is obvious that the rule cannot be invoked unless the police have both actual knowledge of the search and the opportunity to prevent it. These requirements are met when the police are literally "standing by" while a search takes place in their presence. For example, in both *Stapleton* and the case on which it relies (*Moody* v. *United States* (D.C.Mun. App. 1960) 163 A.2d 337) the search was the outcome of a joint civilian-police operation directed against a specific individual, and the police were physically present throughout the significant events. Thus they knew of the search and could have intervened to stop it. By contrast, a common carrier ordinarily conducts its investigations on a random basis whenever a suspicious package is presented for shipment, on the initiative of the employees involved and before law enforcement authorities are called to the scene. The requisite elements of police knowledge and opportunity to intervene are therefore lacking. For the same reason, they are lacking in the case at bar.

A further prerequisite to invoking the *Stapleton-Moody* rule is, manifestly, that the search permitted by the police be illegal. For example, without any color of authority the private party in *Moody* searched the defendant's apartment (cf. *Chapman* v. *United States* (1961) 365 U.S. 610, 613 [5 L.Ed.2d 828, 831, 81 S.Ct. 776]), and in *Stapleton* searched the locked trunk of the defendant's parked automobile (cf. *Preston* v. *United States* (1964) *supra*, 376 U.S. 364, 366-367 [11 L.Ed.2d 777, 779-781]). But a common carrier, as we shall see, ordinarily has independent and reasonable grounds to inspect packages committed to its custody.

When a shipper consigns goods in a sealed package to a common carrier, such matters as rates, insurance values, and methods of handling are customarily determined by the carrier on the basis of the shipper's representations as to the contents of the package. Contrary to early case law on the point (*Hayes* v. *Wells, Fargo & Co.* (1863) 23 Cal. 185, 189-190), current tariff provisions under which regulated carriers operate in California authorize the carrier to open and inspect the package if it suspects that the nature or value of the contents does not correspond to those representations.

Further, because a common carrier has a general duty of care towards all the goods it transports, it also has the right to open and inspect a package which it suspects contains a dangerous device or substance which may damage other goods in the shipment or the vehicle carrying them. (13 Am.Jur.2d, Carriers, § 238, and cases cited.)

Finally, a common carrier, no less than any other citizen, has the right, indeed the duty, not to knowingly allow its property to be used for criminal purposes.[5] While a carrier is bound to accept whatever freight it holds itself out as accustomed to carry (Civ. Code, § 2169), it is obviously not bound to accept freight which it is illegal to possess or transport (see Health & Saf. Code, §§ 11530 [possession of marijuana], 11531 [transportaiton of marijuana]). Although such freight may not present a physical hazard to other goods or the vehicle carrying them, the carrier is not required to risk the injury to its reputation and business which could well ensue from public knowledge that it permits its facilities to be used by criminals for the purpose of trafficking in narcotics. Accordingly, the carrier has the additional right to open and inspect a package which it suspects contains contraband. ▌ This is precisely the basis upon which Gos acted in the case at bar.

We have not overlooked the testimony indicating the police had previously asked Gos and his fellow employees to "be alert" for suspicious persons or packages and to contact the authorities if they should see any. But such a request, whether communicated orally or by means of bulletins or circulars (e.g., *People* v. *Temple* (1969) 276 Cal.App.2d 402, 408 [80 Cal.Rptr. 885]), does not ipso facto create a police agency relationship. Substantial numbers of citizens are deeply concerned about the problem of crime in our society, particularly the dangers posed by the narcotics traffic. By the very nature of their work, employees of common carriers are especially likely to come into contact with that traffic. When the authorities respond to such public interest with drug education programs and generalized appeals for the assistance of the citizenry,[6] they do not automatically "deputize" all those who may have occasion to act on the information thus provided: "There is, certainly, a line to be drawn between joining the police in a specific investigation already launched

---

[5]Thus in *People* v. *Botts* (1967) 250 Cal.App.2d 478, 481-483 [58 Cal.Rptr. 412], it was held that a service station attendant who spied on two men using his restroom for illegal narcotics activities was not acting as an agent of the police and his conduct was not to be judged by Fourth Amendment standards. (Compare *Bielicki* v. *Superior Court* (1962) 57 Cal.2d 602 [21 Cal.Rptr. 552, 371 P.2d 288].)

[6]As concluded by the President's Commission on Law Enforcement and Administration of Justice: "That every American should cooperate fully with officers of justice is obvious . . . . [T]he complexity and anonymity of modern urban life, the existence of professional police forces and other institutions whose official duty it is to deal with crime, must not disguise the need—far greater today than in the village societies of the past—for citizens to report all crimes or suspicious incidents immediately; to cooperate with police investigations of crime; in short, to 'get involved.'" (The Challenge of Crime in a Free Society, Report by the President's Commission on Law Enforcement and Administration of Justice (1967) p. 288.)

by them and making a simple response to a general request for cooperation in detecting crime, a badge of good citizenship." (*Ibid.*)[7]

By the same token we perceive no sinister significance in Gos' practice, which he freely admitted, of leaving open any package which he found to contain a substance he believed to be contraband. An employee of a common carrier who exercises his right to open and inspect a package suspected to contain contraband will, of course, close and reseal that package if his suspicions prove unfounded. It is a non sequitur to require him to do the same when the package does contain apparent contraband. On the contrary, he is entitled at that point to have his suspicions confirmed by persons experienced in identifying narcotics, and who can take appropriate measures if the substance is in fact illegal.

Thus in *People* v. *Lanthier* (1971) 5 Cal.3d 751, 757-758 [97 Cal.Rptr. 297, 488 P.2d 625], a university maintenance man opened a student's briefcase while investigating a noxious odor emanating from a locker; he suspected the contents were marijuana, and the briefcase was turned over to the police for examination. Relying on *McGrew* and *Abt* the student contended that even if it was reasonable for the maintenance man to open the briefcase, he closed it after doing so and its contents were therefore no longer "in plain sight" when the police arrived. Upholding the admissibility of the marijuana thus seized, we said in a unanimous opinion: "In their effort to identify the contents of defendant's briefcase, . . . it was reasonable for the university officials to secure professional advice by enlisting the aid of campus and local police. A single consultation by such officials with a police expert on narcotics falls far short, for example, of a general police-instigated exploratory search of student housing or belongings in the hope of turning up contraband. Rather, the officials' conduct in the case at bar is analogous to that of 'the landlord or bailee who innocently discovers the suspicious circumstances, and seeks expert advice as to the nature of the use to which his premises or facilities are being appropriated. The latter would be no more than an extension of the plain-sight rule, by augmenting the observations of the layman with the expertise of the police.' (*People* v. *Baker* (1970) 12 Cal.App.3d 826, 838 [96 Cal.Rptr. 760].)

---

[7]Nor does an agency relationship arise merely because, as asserted in the case at bar, the police from time to time may ask airline employees to be on the lookout for particular named individuals and to contact the authorities if they are observed. That sort of cooperation is also the sole purpose of the "wanted" posters displayed in all our post offices; yet a citizen who sees such a poster is not thereby transformed into an FBI agent should he later recognize the suspect and either question or detain him.

"Viewed in this light, the question of who opened or closed defendant's briefcase pales into insignificance." (Fn. omitted.)

Here, too, there was no "general police-instigated exploratory search." Rather, as in *Lanthier,* an employee acting on his own initiative opened and inspected a specific container on his employer's premises, and believed its contents were marijuana. At that point he was entitled to show those contents to law enforcement personnel; and just as with the student briefcase in *Lanthier,* the question whether an airline employee awaiting the arrival of the police should leave open the package he has examined, or close it and then reopen it in front of the officer, "pales into insignificance."[8] Whichever choice is made, it cannot reach backwards in time to brand as the act of a police agent the employee's original decision to inspect the package.

We conclude that the evidence fully supports the magistrate's finding of fact that Gos was acting as a private individual when he opened the package here in issue. For the reasons stated, therefore, it was not necessary that in so doing he have probable cause to believe it contained contraband.

### III

 Officer McLaughlin, of course, was required to have such probable cause, and the record contains ample evidence to support such a finding.

At the outset, it must be clearly understood that the issue which divided this court in *People* v. *Marshall* (1968) 69 Cal.2d 51 [69. Cal.Rptr. 585, 442 P.2d 665], is not here presented. There the majority held that because a dwelling cannot be searched on probable cause alone, a warrantless search of a package secreted in a dwelling cannot be justified under the "plain view" exception unless the officer can actually see the contents of the package. (*Id.* at p. 59.) In the case at bar, by contrast, the packages were consigned to a common carrier for shipment and hence, for the reasons stated earlier, could be searched on probable cause. Thus the issue was not whether the marijuana in the packages was in "plain view" but simply whether Officer McLaughlin had probable cause to believe they did contain that narcotic. On this point, the majority opinion in *Marshall* agreed (69 Cal.2d at p. 57, fn. 2) that "an officer may rely on

---

[8]Parenthetically we note that in *Lanthier* the defendant complained because the container was not left open, while in the present case the defendants complain because it was.

all his senses" in determining the presence of such probable cause. (Accord, *People* v. *Temple* (1969) *supra,* 276 Cal.App.2d 402, 410-411, fn. 10.)

■ Applying that rule, the court correctly held that "Reasonable grounds for believing a package contains contraband may be adequately afforded by its shape, its design, and the manner in which it is carried." (*People* v. *Anderson* (1968) 266 Cal.App.2d 125, 132-133 [71 Cal.Rptr. 827]; see also *Hernandez* v. *United States* (9th Cir. 1965) 353 F.2d 624, 627-628; cf. *Henry* v. *United States* (1959) 361 U.S. 98, 104 [4 L.Ed.2d 134, 139-140, 80 S.Ct. 168].) And the same is true of an odor which the package may emit. (*People* v. *Christensen* (1969) 2 Cal.App.3d 546, 548-549 [83 Cal.Rptr. 17], and cases cited.)

■ In the case at bar we note that Officer McLaughlin was qualified on the witness stand as being well versed in the detection and identification of illegal narcotics. He testified that upon walking up to the carton opened by Gos, he observed the brick-shaped packages inside it and smelled a distinctive odor emanating therefrom. He immediately recognized the size, shape and packaging of the bricks to be typical of those used to transport "kilo" quantities of marijuana, and further recognized the odor to be that of marijuana. In the light of all the circumstances, a prudent man of Officer McLaughlin's training and experience could reasonably believe the packages contained contraband.

Predicated on such probable cause, the officer's subsequent search of the packages before him and the remaining four cartons in the shipment was constitutionally reasonable under the rationale of *Chambers,* and the evidence discovered in that search is admissible. Therefore, the trial court's order of suppression, the dismissal of the charges against McKinnon, and the granting of Turk's motion under section 995, were in error.

The orders appealed from are reversed.

Wright, C.J., McComb, J., and Burke, J., concurred.

**PETERS, J.**—I dissent.

I

In *People* v. *McGrew,* 1 Cal.3d 404 [82 Cal.Rptr. 473, 462 P.2d 1], law enforcement officials conducted a similar search of a trunk consigned to an airline. There too the police had probable cause to believe that the trunk contained marijuana. We correctly held, in my view, that the search without a warrant was unreasonable and therefore a violation of the defendant's Fourth Amendment rights. The majority in the instant

case in overruling *McGrew* have totally abrogated the Fourth Amendment requirement of a search warrant insofar as concerns goods consigned to a common carrier.

In *McGrew* we summarized Fourth Amendment principles: "*People* v. *Marshall,* 69 Cal.2d 51, 57 [69 Cal.Rptr. 585, 442 P.2d 665], makes clear that with certain exceptions, probable cause to believe that 'a search will reveal contraband . . . does not justify a search without a warrant.' Where there is probable cause, a warrant still must be obtained, absent an emergency, for a search not incident to a valid arrest even though a warrant would not be needed for a search incident to an arrest. (E.g., *People* v. *Harris,* 62 Cal.2d 681, 682-683 [43 Cal.Rptr. 833, 401 P.2d 225].)

"The exceptions to the requirement of a search warrant, aside from searches incident to an arrest, are where there is a danger of ' "imminent destruction, removal, or concealment of the property intended to be seized" ' or where the evidence is in plain sight, which 'is, in fact, no search for evidence.' (*People* v. *Marshall, supra,* 69 Cal.2d 51, 56-57, 61.)

". . . The Fourth Amendment protection of 'effects' includes securely closed footlockers shipped through common carriers. Neither the language of the Fourth Amendment, nor of any of the cases interpreting the protection of that amendment, suggest that warrants apply to 'houses' but not to 'effects.' The exceptions to the requirement of a warrant are based on circumstances and not on categories of items. . . ." (1 Cal.3d at p. 409.)

In *McGrew* the People contended, as they do here, that footlockers are movable and therefore in imminent danger of removal. This court said then that there was *no* danger of imminent removal or destruction of the evidence in circumstances like those before us. The majority should either reiterate today or forthrightly recant that statement because if it is true there are no special circumstances to justify a search without a warrant and the search was invalid.

I believe that *McGrew* is good law today. It should be; the law applied there is fundamental to our constitutional jurisprudence. The majority find no fault with our decision of three years ago. They do not quarrel with its logic or the principles upon which it relies. They rather purport to rely on the subsequent case of *Chambers* v. *Maroney,* 399 U.S. 42 [26 L.Ed.2d 419, 90 S.Ct. 1975], a vehicle case which is not controlling, while giving little or no weight to the most recent vehicular search case, *Coolidge* v. *New Hampshire,* 403 U.S. 443 [29 L.Ed.2d 564, 91 S.Ct. 2022].

In *Chambers*, the police arrested men they had every reason to believe were robbers fleeing from the scene of the crime. The defendants' car was taken to the police station, where it was searched without a warrant. Although the car was for practical purposes immobilized, the high court stated that its prior mobility "still obtained at the station house . . . unless the Fourth Amendment permits a warrantless seizure of the car and the denial of its use to anyone until a warrant is secured. In that event there is little to choose in terms of practical consequences between an immediate search without a warrant[1] and the car's immobilization until a warrant is obtained. . . ." (399 U.S. 42, 52 [26 L.Ed.2d 419, 428-429].)

Mr. Justice Harlan, in dissent, ably responded to this contention: "The Fourth Amendment proscribes, to be sure, unreasonable 'seizures' as well as 'searches.' However, in the circumstances in which this problem is likely to occur, the lesser intrusion will almost always be the simple seizure of the car for the period—perhaps a day—necessary to enable the officers to obtain a search warrant. . . . [P]ersons who wish to avoid a search—either to protect their privacy or to conceal incriminating evidence—will almost certainly prefer a brief loss of the use of the vehicle in exchange for the opportunity to have a magistrate pass upon the justification for the search. To be sure, one can conceive of instances in which the occupant . . . would be more deeply offended by a temporary immobilization of his vehicle than by a prompt search of it. However, such a person always remains free to consent to an immediate search, thus avoiding any delay. Where consent is not forthcoming, the occupants of the car have an interest in privacy that is protected by the Fourth Amendment even where the circumstances justify a temporary seizure. [Citation.] . . ." (399 U.S. 42, 63-64 [26 L.Ed.2d 419, 435-436].)

I believe Mr. Justice Harlan's to be the reasoned view, but of course am bound by the result reached by the majority, a result I thought reasonably apparent after *Cooper* v. *California*, 386 U.S. 58 [17 L.Ed.2d 730, 87 S.Ct. 788]. (*People* v. *Webb*, 66 Cal.2d 107, 128 [56 Cal.Rptr. 902, 424 P.2d 342, 19 A.L.R.3d 708].)[2]

---

[1]Such a search would be valid pursuant to *Carroll* v. *United States*, 267 U.S. 132, 153 [69 L.Ed. 543, 551, 45 S.Ct. 280, 39 A.L.R. 790]. Since the car was *not* searched immediately on the highway *nor* immobilized until a warrant could be obtained, the court's statement concerning the car's continuing "mobility" clearly indicates that the search at the police station must be considered to have been "immediate."

[2]*Webb* involved almost precisely the same fact situation as that in *Chambers*. The majority sustained the search on the theory that, although removed in time and place from the arrest, it was nevertheless incident to it. I concurred only because I believed that *Cooper* v. *California, supra*, 386 U.S. 58, presaged the *Chambers* case. It may be noted that the majority in *Chambers* expressly held that a search

*Chambers,* however, does not purport to apply to everything that is not nailed down or affixed to realty. The Supreme Court's opinion is closely tied to a long series of cases involving one and only one form of movable object—that which is used as a vehicle to transport goods from one place to another.

*Carroll* v. *United States, supra,* 267 U.S. 132, is the seminal case upon which *Chambers* is based and the United States Supreme Court decision in which the problem is treated at length. The *Carroll* court carefully analyzed the colonial writs of assistance and contemporaneous legislation enacted by the first few Congresses, concluding that "contemporaneously with the adoption of the Fourth Amendment we find in the first Congress, and in the following Second and Fourth Congresses, a difference made as to the necessity for a search warrant between goods subject to forfeiture, when concealed in a dwelling house or similar place, and like goods in course of transportation *and concealed in a movable vessel* where they readily could be put out of reach of a search warrant. . . ." (267 U.S. 132, 151 [69 L.Ed. 543, 550]; italics added.)

The *Carroll* court never attempted to state a rule applicable to all movable items. Rather it sought to recognize "a necessary difference between a search of a store, dwelling house or other structure . . . and a search of a *ship, motor boat, wagon* or *automobile,* for contraband goods, where it is not practicable to secure a warrant because the *vehicle* can be quickly moved out of the locality or jurisdiction in which the warrant must be sought." (*Id.,* at p. 153 [69 L.Ed. at p. 551]; italics added.) Every United States Supreme Court case which follows *Carroll* has involved a vehicle. (*Husty* v. *United States,* 282 U.S. 694 [75 L.Ed. 629, 51 S.Ct. 240, 74 A.L.R. 1407]; *Scher* v. *United States,* 305 U.S. 251 [83 L.Ed. 151, 59 S.Ct. 174]; *Preston* v. *United States,* 376 U.S. 364 [11 L.Ed.2d 777, 84 S.Ct. 881]; *Dyke* v. *Taylor Implement Co.,* 391 U.S. 216 [20 L.Ed.2d 538, 88 S.Ct. 1472]; *Chambers* v. *Maroney, supra,* 399 U.S. 42; *Coolidge* v. *New Hampshire, supra,* 403 U.S. 443.)

The most recent case to address itself to the problems of a vehicular search is *Coolidge* v. *New Hampshire, supra,* 403 U.S. 443. The majority attempt to distinguish that case from the instant case insofar as it attempts to clarify the rule of the search without a warrant in exigent circumstances, and in the end the majority maintain that because no clear majority supported the opinion of the court in its entirety the opinion is of no significance insofar as the instant case is concerned. I disagree with both points.

---

so removed in time and place could *not* be construed as incident to an arrest. (399 U.S. at p. 47 [26 L.Ed.2d at p. 426].)

In *Coolidge,* the car was parked outside the house and was not being used at the time it was seized by the police. There was no way for the defendant to gain access to the automobile once the police had arrived at his home. Furthermore, Mrs. Coolidge and her baby were also taken to other lodging where the police stayed with them for the remainder of the night. The car was towed to the police station by midnight and the Coolidge house was kept under strict guard for the entire evening.

Just as the car in *Coolidge* could not seem to be moved or hidden by any of the suspects, so too the five cartons in the instant case were unable to be moved, at least not without the police seeing their movement by the defendants and arresting them with probable cause. In both cases, the exigent circumstances that *Carroll* and *Chambers* require are non-existent, and five justices of the Supreme Court held that in the absence of those circumstances the search of the car without a warrant could not be upheld.

The majority state that Justice Stewart's plurality opinion "was in any event signed by only four members of the court (Stewart, J., Douglas, J., Brennan, J., and Marshall, J.)" and for this reason " 'is without force or precedent.' " What the majority do not tell us is that the fifth member of the United States Supreme Court who joined to make the majority in *Coolidge* in reversing the conviction expressly joined in part II—D of Justice Stewart's opinion and that part is directly in point here. That part of Justice Stewart's opinion was a vigorous attack and rejection on a dissenting opinion which set forth views substantially similar to those expressed by the majority in the case before us.

Justice Stewart in part II—D of his opinion expressly stated: *"Since the police knew of the presence of the automobile and planned all along to seize it, there was no 'exigent circumstance' to justify their failure to obtain a warrant. The application of the basic rule of Fourth Amendment law therefore requires that the fruits of the warrantless seizure be suppressed."* (403 U.S. at p. 478 [29 L.Ed.2d at p. 590]; italics added.)

In part II—D Justice Stewart further maintains, "The stopping of a vehicle on the open highway and a subsequent search amount to a major interference in the lives of the occupants. *Carroll* held such an interference to be reasonable without a warrant, given probable cause. It may be thought to follow *a fortiori* that the seizure and search here—where there was no stopping and the vehicle was unoccupied—were also reasonable, since the intrusion was less substantial, although there were no exigent circumstances whatever. Using reasoning of this sort, it is but a short step to the position that it is *never* necessary for the police to obtain a warrant before search-

ing and seizing an automobile, provided that they have probable cause. And MR. JUSTICE WHITE appears to adopt exactly this view when he proposes that the Court should 'treat searches of automobiles as we do the arrest of a person.'

"If we were to accept MR. JUSTICE WHITE's view that warrantless entry for purposes of arrest and warrantless seizure and search of automobiles are *per se* reasonable, so long as the police have probable cause, it would be difficult to see the basis for distinguishing searches of houses and seizures of effects. If it is reasonable for the police to make a warrantless nighttime entry for the purpose of arresting a person in his bed, then surely it must be reasonable as well to make a warrantless entry to search for and seize vital evidence of a serious crime. If the police may, without a warrant, seize and search an unoccupied vehicle parked on the owner's private property, not being used for any illegal purpose, then it is hard to see why they need a warrant to seize and search a suitcase, a trunk, a shopping bag, or any other portable container in a house, garage, or back yard." (At pp. 479-480 [29 L.Ed.2d at pp. 590-591]; italics in the original.)

And finally what could be a more clear expression of the inapplicability of the *Carroll-Chambers* rule than when Justice Stewart concludes, "We are convinced that the result reached in this case is correct, and that the principle it reflects—that the police must obtain a warrant when they intend to seize an object outside the scope of a valid search incident to arrest—can be easily understood and applied by courts and law enforcement officers alike. It is a principle that should work to protect the citizen without overburdening the police, and a principle that preserves and protects the guarantees of the Fourth Amendment." (At p. 484 [29 L.Ed.2d at p. 593].)

Thus, the five justices who reversed the conviction in *Coolidge* would not agree with the analysis of the majority in the instant case in allowing a search of the five cartons in question without a warrant.

The rule of *Carroll,* and its progeny is clear. Where the goods are in the course of transportation, i.e., in a *vehicle* capable of conveying them beyond the jurisdiction, a search without a warrant may be conducted by a law enforcement officer who has probable cause to believe that seizable goods will be found. A carton in a freight office is not a vehicle. It may be used to store goods or to package them for shipment; a carton *cannot* get from here to there on its own power.

The majority state that if the mobility of a car still obtains at the station house, "a fortiori a chattel such as here involved remains 'mobile' in the

constitutional sense despite its limited and voluntary bailment to a carrier." Indeed, chattels will retain their movable character anywhere, whether within a depot, dwelling house, or concrete vault as well as an airport, unless they are affixed to realty or otherwise rendered *non*movable. The point is not that the chattels here involved were within the custody of the airlines, but that they were *not* in a vehicle capable of moving them beyond the jurisdiction on its own power; i.e., they had not entered the course of transportation. Drawing a line at goods physically aboard a carrier at least has the virtue of certainty. This is the line drawn by the United States Supreme Court in case after case. If *all* things movable could be searched without a warrant if there were probable cause to believe they contained evidence or contraband, the Fourth Amendment would be rendered nugatory, and in effect the search without a warrant would become the rule rather than the exception.

## II

With respect to the discussion of agency, I agree with the majority that there was sufficient evidence before the magistrate to establish that Gos was not the agent of the law enforcement officers. Nevertheless, there was conflicting evidence, and I do not believe that the magistrate's determination may be upheld on the record before us. It is clear from that record that the magistrate applied an improper standard in determining the agency question. As the majority recognize in footnote 2 of their opinion, the basis of the magistrate's decision was that he had heard no evidence of agency. In the case before us, the testimony of Etta Durden, if believed, established as a matter of law that Gos was acting as an agent of the police department, and the magistrate in ruling that there was no evidence was obviously applying an improper standard. Although Etta Durden's testimony might have been rejected by the magistrate, he did not do so.

Miss Durden was hired to interview airport freight agents and their role in helping law enforcement officials control narcotics transportation. She testified as a result of her conversation with Gos "that the police had asked him [Gos] to be alert for any suspicious individuals who are shipping packages and if they are suspicious, to open them and the policy was to leave the boxes open and call the State Narcotics Bureau."

The majority do not discuss the plain effect of this testimony, and their holding in today's decision should not be read as affirmatively sanctioning the practice of police officers requesting private citizens to make indiscriminate searches and seizures without even probable cause. Otherwise, the impact of this decision would allow the police to unofficially deputize a

private individual, and where the police cannot search without a warrant, the private individual at the direction and suggestion of the police can, and any evidence uncovered will be fully admissible in a court of law. I submit that condoning this practice will inevitably lead to the type of society George Orwell described in his novel "1984," where an individual's private life is nonexistent and everyone is an agent of the state.

With regard to Gos' search of the cartons, I do not conclude that an airline employee, acting as an agent of the airline pursuant to a CAB regulation enacted for the protection of the airline, cannot open a box or shipment if he suspects the consignor has overinsured it as part of a plan to make a fraudulent insurance claim at a later date. If the employee is acting for the best interests of the airline and for its protection without any direction from the police, I agree with the majority that he is acting as a private individual and such a search would not make him an agent of the police.

However, the magistrate's determination was based on the premise that he had not heard any evidence of agency. This was false. There was clear evidence of agency. Although there was also conflicting evidence, the magistrate did not resolve the conflict and obviously applied an erroneous standard. In failing to consider the evidence of agency, the majority have failed to consider the real issue in this case.

### III

I am distressed that this court today bulldozes new inroads through the protective covering of the Fourth Amendment. It is of course a general principle of our jurisprudence that the Bill of Rights be construed liberally to protect those rights deemed so essential to a free nation. Because the Fourth Amendment prohibits only "unreasonable" searches and seizures, rather than setting down an absolute standard of conduct, fidelity to this principle of constitutional construction is here even more important. For in Fourth Amendment cases, as distinguished from the absolute measuring rod of the First Amendment's dictates, our characterization of what is reasonable and unreasonable in each case will affect the standard used in succeeding cases. Unless exceptions to the rule that a warrant be obtained prior to search are granted only where compelling necessity requires immediate action, there is substantial danger that over time "[r]ights declared in words might be lost in reality." (*Weems* v. *United States*, 217 U.S. 349, 373 [54 L.Ed. 793, 801, 30 S.Ct. 544].) I fear that today's decision *is only the beginning of more shocking intrusions upon* Fourth Amend-

ment rights. I see no reason, for example, why "common sense" (to use the majority's finely honed analytical concept) should not extend the right to search without a warrant to goods within a dwelling that are so packaged that they could easily be moved, such as any goods in a paper bag or box.

The majority today take what they regard as a small step. Because of the ratio decidendi on which they rely, however, this must be only the beginning of a long journey toward a society devoid of private sanctuaries. The words of Justice Bradley, writing 85 years ago, retain their vitality today: "It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon. Their motto should be *obsta principiis.* . . ." (*Boyd* v. *United States,* 116 U.S. 616, 635 [29 L.Ed. 746, 752, 6 S.Ct. 524].) I would withstand this beginning; I would affirm the orders of the lower court.

Tobriner, J., concurred.

**SULLIVAN, J.**—I join in Parts I and III of Justice Peters' dissenting opinion. I would therefore affirm the orders appealed from.